## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

---

**UNITED STATES OF AMERICA**,
*ex rel.* ABC,

           **Plaintiff,**

    v.

**XYZ,**

          **Defendants.**

Case No. CV418 128

**Jury Trial Demanded**

**Filed Under Seal**
31 U.S.C. § 3730(b)(2)

---

### COMPLAINT
### Claims Pursuant to the False Claims Act, 31 USC § 3729, et seq.

### [FILED IN CAMERA AND UNDER SEAL]

---



FILED
U.S. DISTRICT COURT
SAVANNAH DIV.
2018 MAY 29 PM 1:49
CLERK
SO. DIST. OF GA.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA, *ex rel.*
STATE OF GEORGIA, *ex rel.*

E. JERRY COHN, JR., M.D. and
SHARON BELL,

        Plaintiffs,

    v.

GENESIS VASCULAR OF POOLER, LLC;
GENESIS GLOBAL HEALTHCARE;
GENESIS HEALTHCARE MANAGEMENT, LLC;
GENESIS VASCULAR, LLC;
JAMES O'DARE;
BARBARA O'DARE;
DONALD GEER;
DR. ABRAHAM LIN;
DR. STANLEY SHIN;
DR. TODD NEWSOM;
DR. HOWARD GALE;
DR. LEONARD TALARICO;
DR. DAVID NABERT;
DR. TODD BECKER; and
DR. BRIAN MOOGERFIELD,

        Defendants.

CV418 128

Case No.

**Jury Trial Demanded**



**Filed Under Seal**
31 U.S.C. § 3730(b)(2)

---

**COMPLAINT**
Claims Pursuant to the False Claims Act, 31 USC § 3729, *et seq*.

---

## I. INTRODUCTION

1.    The United States of America and the State of Georgia, by and through *qui tam* originating Relators E. Jerry Cohn, Jr., M.D. and Sharon Bell ("Relators"), hereby bring this action pursuant to the False Claims Act ("FCA"), as amended, 31 U.S.C. § 3729, *et seq*., and the Georgia False Claims Act, O.C.G.A. § 49-4-168.1, against Genesis Vascular of Pooler, LLC; Genesis Global Healthcare; Genesis Healthcare Management, LLC; Genesis Vascular, LLC; James O'Dare; Barbara O'Dare; Donald Geer; Dr. Abraham Lin; Dr. Stanley Shin; Dr. Todd Newsom; Dr. Howard Gale; Dr. Leonard Talarico; Dr. David Nabert; Dr. Todd Becker; and Dr. Brian Moogerfield ("Defendants"), alleging that Defendants knowingly made false statements and knowingly submitted or caused the submission of false claims to Medicare, Medicaid, TRICARE/CHAMPUS and the Federal Employee Health Benefits Program, for excessive, medically unnecessary, and inadequately documented vascular procedures.

2.    From around December of 2016 through the present, Defendants have engaged in a pattern and practice of performing and billing federal and state healthcare programs for an excessive number of invasive procedures to treat peripheral artery disease, including angiography, angioplasty, atherectomy, and stent implantation. Instead of ordering these high-risk procedures after exhausting non-invasive alternative therapies, Defendants have regularly subjected patients to peripheral artery interventions when they were not medically necessary and without properly evaluating and documenting medical necessity.

3.    Defendants knew, deliberately ignored, or recklessly disregarded the fact that many of the vascular procedures for which claims were submitted to federal and state healthcare programs were not indicated by patients' medical histories and records or the severity of

patients' symptoms. Nevertheless, Defendants falsely certified that the procedures were medically necessary.

4.     To facilitate their fraudulent practice, and in violation of the Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), the Defendants either paid or received remunerations for the unlawful referral of services performed at Defendant Genesis Vascular of Pooler, LLC upon the beneficiaries of Medicare, Medicaid and other federal healthcare programs.

5.     Defendants' fraudulent conduct of paying and receiving kickbacks and performing medically-unnecessary and invasive arterial procedures has placed, and continues to place patients at significant risk of harm.

## II. PARTIES

6.     Plaintiff-Relator E. Jerry Cohn, Jr., M.D. is a resident of Georgia and has direct knowledge of Defendants' fraud as alleged herein.

7.     Plaintiff-Relator Sharon Bell is a resident of Georgia and has direct knowledge of Defendants' fraud as alleged herein.

8.     Defendant Genesis Vascular of Pooler, LLC is a Delaware limited liability company that maintains its principal place of business at 1000 Towne Center Boulevard, Building 400, Pooler, Georgia.

9.     Defendant Genesis Global Healthcare is a corporate entity through which Defendants James O'Dare, Barbara O'Dare and Donald Geer communicate with, provide data to, and give instruction to the physician-investor Defendants identified below.

10.    Defendant Genesis Healthcare Management, LLC is the Manager of Genesis Vascular of Pooler, LLC.

11.     Defendant Genesis Vascular, LLC, located at 575 Route 73 North, Suite A-6, West Berlin, New Jersey, is an investor in Genesis Vascular of Pooler, LLC.

12.     Defendant James O'Dare is an investor in Genesis Vascular of Pooler, LLC.  Mr. O'Dare is also a Founder and Principal of Defendant Genesis Healthcare Management, LLC, the entity that manages Genesis Vascular of Pooler, LLC.   Mr. O'Dare is the husband of Defendant Barbara O'Dare.  Mr. O'Dare is listed as a Principal of several other vascular centers throughout the country, including Genesis Vascular Centers in Las Vegas, Nevada and Salt Lake City, Utah.

13.     Defendant Barbara O'Dare is the Chief Executive Officer of Defendant Genesis Global Healthcare. Ms. O'Dare claims to have developed over two dozen vascular centers throughout the United States.  Through Genesis Global Healthcare, Ms. O'Dare assists in operating Genesis Vascular of Pooler and other purported vascular centers.  Upon information and belief, Ms. O'Dare is an investor in Genesis Vascular of Pooler, LLC and many other purported vascular centers throughout the country, including centers in Las Vegas, Nevada; Salt Lake City, Utah; and in New Jersey and Pennsylvania. Ms. O'Dare is the wife of Defendant James O'Dare.

14.     Donald Geer assists in operating Defendant Genesis Vascular of Pooler, LLC and other purported vascular centers.  Upon information and belief, Mr. Geer is an investor in Genesis Vascular of Pooler, LLC and other purported vascular centers throughout the country.

15.     Defendant Dr. Abraham Lin is a cardiologist licensed to practice medicine in Georgia. Dr. Lin's principal office is located at Statesboro Cardiology PC, 5 Grady Johnson Road, Statesboro, Georgia.  Dr. Lin is an investor in Genesis Vascular of Pooler, LLC; he refers patients to Genesis Vascular of Pooler, LLC; and, he performs excessive and medically unnecessary peripheral artery interventions at Genesis Vascular of Pooler, LLC on beneficiaries of Medicare, Medicaid and other federal and state healthcare programs.

16.    Defendant Dr. Stanley Shin is a cardiologist licensed to practice medicine in Georgia. Dr. Shin's principal office is located at Statesboro Cardiology PC, 5 Grady Johnson Road, Statesboro, Georgia. Dr. Shin is an investor in Genesis Vascular of Pooler, LLC; he refers patients to Genesis Vascular of Pooler, LLC; and, he performs excessive and medically unnecessary peripheral artery interventions at Genesis Vascular of Pooler, LLC on beneficiaries of Medicare, Medicaid and other federal and state healthcare programs.

17.    Defendant Dr. Todd Newsom is a podiatrist licensed to practice medicine in Georgia. Dr. Newsom's principal office is located at Atlantic Foot & Ankle Specialists, 114 Canal Street, Suite 703, Pooler, Georgia. Dr. Newsom is an investor in, and refers patients to Genesis Vascular of Pooler, LLC.

18.    Defendant Dr. Howard Gale is a podiatrist licensed to practice medicine in Georgia. Dr. Gale's principal office is located at Ankle & Foot Associates, LLC, 1088 Bermuda Run Road, Suite B, Statesboro, Georgia. Dr. Gale is an investor in, and refers patients to Genesis Vascular of Pooler, LLC.

19.    Defendant Dr. Leonard Talarico is a podiatrist licensed to practice medicine in Georgia. Dr. Talarico's principal office is located at The Foot & Ankle Center, PC, 140 Traders Way, Pooler, Georgia. Dr. Talarico is an investor in, and refers patients to Genesis Vascular of Pooler, LLC.

20.    Defendant Dr. David Nabert is a cardiologist licensed to practice medicine in Georgia. Dr. Nabert's principal office is located at Statesboro Cardiology PC, 5 Grady Johnson Road, Statesboro, Georgia. Dr. Nabert is an investor in, and refers patients to Genesis Vascular of Pooler, LLC.

21.     Defendant Dr. Todd Becker is a podiatrist licensed to practice medicine in Georgia. Dr. Becker's principal office is located at Ankle & Foot Associates, LLC, 1088 Bermuda Run Road, Suite B, Statesboro, Georgia.   Dr. Becker is an investor in, and refers patients to Genesis Vascular of Pooler, LLC.

22.     Defendant Dr. Brian Moogerfield is an internist licensed to practice medicine in Georgia. Dr. Moogerfield's principal office is located Moogerfield Internal Medicine, 1088A Bermuda Run Road, Statesboro, Georgia.  Dr. Moogerfield is an investor in, and refers patients to Genesis Vascular of Pooler, LLC.

### III.  JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 1367(a) and 31 U.S.C. § 3732.

24.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process in cases brought under the False Claims Act, and because, among other reasons, all Defendants have offices in this District, have transacted business in this District, have engaged in wrongdoing in this District, and have at least minimum contacts with the District.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because the Defendants can be found in this District, all transact business here, and the acts proscribed by 31 U.S.C. § 3729, *et seq.*, occurred here.

26.     Relators have standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1).

## IV. <u>STATUTORY AND REGULATORY FRAMEWORK</u>

### <u>The Federal False Claims Act</u>

27.     The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, among other things, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

28.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

29.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

30.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

31.     Private citizens, such as Relators, can bring actions on the Government's behalf. "(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C.A. § 3730(b)(1).

32.     There has been no public disclosure under 31 U.S.C. § 3730(e), of the allegation or transactions in this Complaint with respect to which Plaintiff-Relators are not an "original source," and all material information relevant to this Complaint was provided to the United States Government prior to filing this Complaint as required by 31 U.S.C. § 3730(e)(4)(B). Relators have direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations herein have been "publicly disclosed," Relators have knowledge that is independent of and materially adds to such publicly disclosed allegations.

### The Georgia False Medicaid Claims Act

33.     The Georgia False Medicaid Claims Act (GAFMCA) provides that any person who knowingly makes or causes to be made any false statement or representation of a material fact for use in determining right to a payment from the Georgia Medicaid Program is liable for three times the amount of all payments judicially found to have been fraudulently received from Medicaid or its fiscal agents because of the act of that person, plus a civil penalty. O.C.G.A. § 49-4-168.1. The GAFMCA defines "knowingly" to mean that a person "has actual knowledge of the information or acts in deliberate ignorance or reckless disregard of the truth or falsity of the information." O.C.G.A. § 49-4-168.

### The Anti-Kickback Statute

34.     The Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that remuneration given to those who can influence healthcare decisions could corrupt

the medical decision-making process.   To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization.

35.     The AKS prohibits any person or entity from knowingly and willfully offering, paying, soliciting, making or accepting payment to induce or reward any person or entity for referring, recommending or arranging any good or item for which payment may be made in whole or in part by a federal health care program.

36.     In 2010, Congress amended the AKS to state that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient and Affordable Care Act of 2010, § 6402(f), 42. U.S.C. § 1320a-7b(g).

## V. FEDERAL AND STATE HEALTHCARE PROGRAMS

### Medicare

37.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for healthcare services for certain individuals. 42 U.S.C. § 1395, *et seq*.   The Medicare program is a federally-operated healthcare program.   It is administered by the Secretary of Health and Human Services (HHS) through the Centers for Medicare and Medicaid Services (CMS), a Department of HHS.

38.     Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of the fee schedule amount of physician and laboratory services.  42 U.S.C. § 1395k, l and x(s).

39.     To participate in Medicare, providers must certify that their services are provided economically and only when and to the extent medically required, or that the services are "reasonable and necessary," as required by statute. 42 U.S.C. § 1395n, 42 U.S.C. §

1395y(a)(1)(A).   A service is expressly excluded from coverage if it is "not reasonable and necessary" for "the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 411.15(k)(1).  In other words, it is an express condition of payment that the treatment sought under Medicare must be medically necessary.

40.    Medicare providers are obligated to understand and certify their compliance with all applicable Medicare laws, regulations, and program instructions as a condition of participation in Part B and as a condition of payment of Medicare reimbursements.

41.    Medicare providers, like the Defendants, are reimbursed for covered services based on their submission of an electronic or hard-copy claim form titled the CMS Form 1500 Health Insurance Claim Form.

42.    When submitting claims to Medicare, providers must certify on CMS Form 1500 that: (a) the services rendered are "medically indicated and necessary for the health of the patient;" (b) the information on the claim form is "true, accurate and complete;" and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws." After a February 2012 revision to CMS Form 1500, providers must further certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the [AKS] . . . ."

43.    CMS Form 1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

**Medicaid**

44.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.   Each state administers its own Medicaid program, under federal regulations that generally govern what services should be provided and under what conditions.   CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards.   The federal government provides a portion of each state's Medicaid funding.

45.     As under Medicare, a "claim" under Medicaid is only reimbursable if it is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 402.3.

**TRICARE/CHAMPUS**

46.     In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), which is a federally funded medical program created by Congress.  10 U.S.C. § 1071.  CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

47.     In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. § 199.4, 199.17(a). Since the establishment of TRICARE, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just TRICARE.  The purpose of TRICARE is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1).

48. As with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. § 199.6(a)(5).

### Federal Employee Health Benefits Program

49. The Federal Employee Health Benefits Program (FEHBP) is a federally-funded medical insurance program for federal employees, retirees, their spouses and unmarried, dependent children under age 22, administered by the Office of Personnel Management (OPM) pursuant to 5 U.S.C. § 8901, *et seq*. Through the OPM, the federal government contracts with private health plans or "carriers" to deliver health benefits to its employees.

50. Like Medicare, Medicaid and TRICARE, FEHBP will not cover any treatment or surgery that is not medically necessary. 5 U.S.C. § 8902(n)(1)(A).

### VI. PERIPHERAL ARTERY DISEASE

51. Peripheral artery disease ("PAD") is the narrowing or blockage of peripheral arteries and consequent reduction of blood flow to the limbs.

52. PAD is usually caused by atherosclerosis—the buildup of cholesterol and fatty deposits called "plaques" on the inner walls of the arteries. Plaques restrict blood flow to the limbs and other parts of the body by clogging arteries or causing abnormal artery function. Cardiovascular specialists and other medical professionals refer to this narrowing or blockage as a "lesion" or "stenosis."

53. PAD includes a spectrum of syndromes ranging from intermittent "claudication" to "critical limb ischemia." Claudication is exertional leg pain caused by obstructed arteries. "Critical limb ischemia" usually involves non-exertional or resting leg pain, non-healing

wounds, ulcers, or gangrene. Most patients with PAD have only intermittent claudication, which is typically unlikely to progress to critical limb ischemia.

54.    PAD that is significant enough to warrant treatment must be specifically and appropriately evaluated, diagnosed, and managed. Peripheral arteries may be significantly or completely blocked and still not require intervention because more than one artery supplies blood to the peripheral tissue. Accordingly, a provider must evaluate the severity of the PAD and its impact on a patient's symptoms and functionality through non-invasive testing before resorting to invasive procedures.

55.    Commonly used non-invasive testing for PAD includes physical examination for, among other things, a diminished pulse; a whooshing sound (or "bruit") heard over arteries using a stethoscope; and poor wound healing in areas where blood flow may be restricted. Another technique compares systolic blood pressure in the ankle to systolic blood pressure in the arm, and evaluates the resulting ratio, referred to as the "ankle-brachial index" ("ABI").

56.    Other, more sophisticated non-invasive testing for PAD involves techniques like segmental blood pressure recordings; pulse volume recordings ("PVRs"); Doppler flow measurements with ultrasound (or "lower extremity arterial Duplex"); magnetic resonance angiography ("MRA"); and computerized tomography angiography ("CTA"). MRA and CTA involve the injection of contrast material (or "dye") into the blood vessels to enable the cardiovascular specialist to view vascular anatomy without using an invasive catheter-based approach.

57.    Non-invasive treatment for PAD often includes medications such as aspirin, statins (cholesterol-lowering drugs), and cilostazol (the generic name of a drug used to treat

claudication); dietary modifications; exercise programs; and risk factor modification, especially smoking cessation.

58.     If non-invasive tests corroborate the severity of the PAD—and if disabling claudication or critical limb ischemia has developed—a physician may perform invasive testing to determine if "revascularization" is necessary. Revascularization refers to the use of invasive techniques, either catheter-based or surgical, to restore adequate blood flow to the affected limb and relieve symptoms.

59.     Catheter-based angiography, or an "angiogram," is an invasive imaging procedure that involves the insertion of a long, narrow tube called a "catheter" into a blood vessel in the arm or leg. The catheter is guided through the blood vessel to the artery of interest with the aid of an x-ray imaging technique called fluoroscopy. Dye is injected through the catheter into the vessel to make its internal dimensions visible.

60.     Balloon angioplasty can be performed inside the artery in conjunction with catheter-based angiography. After anti-coagulating a patient with blood thinner, a balloon catheter is passed over a guide-wire into a significantly narrowed portion of the artery and inflated to reduce the severity of the blockage. The balloon catheter and guide-wire are then removed.

61.     Atherectomy is another invasive catheter-based treatment that involves the use of a sharp blade, burr, or laser housed within a catheter to excise or obliterate plaques from within an artery.

62.     Stents are small metallic mesh tubes that are placed inside a blocked or narrowed artery to keep the vessel open after it has been dilated or torn, typically after balloon angioplasty. Stents are used depending on certain features of the clogged vessel, including the extent and location of the blockage.

63.     Angiography, angioplasty, atherectomy, and stent implantation are invasive procedures that usually require conscious sedation and subject patients to some risk of harm.

64.     Any invasive procedure can lead to "re-stenosis" or re-narrowing due to scar build-up at the site of intervention. The catheter can tear or rupture blood vessels causing internal bleeding and dislodge plaques from the arterial wall that can travel downstream or "embolize" into the circulation and lead to stroke, heart attack, or poor blood flow to a limb.

65.     The dye injected into the arteries during a catheterization procedure can cause allergic reactions or kidney failure, and the radiation used for imaging can lead to injuries ranging from dermatitis to cancer.

66.     Stents can trap or "jail" other arteries depending on their placement, sometimes cutting off important alternative avenues of collateral circulation.  Stents can also limit surgical options for revascularization. Excessive stenting can limit the number of viable, un-stented arteries into which a bypass can be connected.

67.     Medicare, Medicaid, TRICARE and FEHBP providers are not entitled to bill or receive payment for any peripheral artery angiography, angioplasty, atherectomy, or stent implantation that is not reasonable and medically necessary.

68.     Clinical indications of the medical necessity of peripheral artery interventions are published in multiple public sources, including national guidelines issued by industry groups such as the American College of Cardiology Foundation and the American Heart Association.

69.     Clinically significant peripheral vascular disease, according to the American College of Cardiology Foundation and the American Heart Association, may exist when a peripheral artery is at least 50 to 75 percent blocked. *See* Jeffrey L. Anderson, *et al*., "Management of Patients with Peripheral Artery Disease (Compilation of 2005 and 2011 ACCF/AHA Guideline

Recommendations)," *Journal of the American College of Cardiology*, Vol. 61, No. 14 (Apr. 2013)(hereinafter "PAD Guidelines"). As a general principle, "[e]ndovascular intervention is not indicated as prophylactic therapy in an asymptomatic patient with lower extremity PAD." *Id.* Thus, prior to performing an interventional procedure in the peripheral arteries, Medicare, Medicaid, TRICARE and FEHBP providers must assess the medical necessity of the intervention through a detailed evaluation, and thoroughly document the clinical indications necessitating the intervention.

70. In general, only after providers have exhausted non-invasive tests and treatments—and after symptoms prove to be recurrent—should invasive procedures be performed on Medicare, Medicaid, TRICARE and FEHBP patients with severe PAD. "Due to the variability of ischemic limb symptoms and impact of these symptoms on functional status and QoL (Quality of Life), patients should be selected for revascularization on the basis of the severity of their symptoms. Factors to consider include a significant disability as assessed by the patient, adequacy and response to medical and structured exercise therapies, status of co-morbid conditions and a favorable risk/benefit ratio." Marie D. Gerhard-Herman, *et al.*, "2016 AHA/ACC Guideline on the Management of Patients with Lower Extremity Peripheral Arterial Disease: Executive Summary," *Circulation* (2017).

## VII. **FACTUAL BACKGROUND**

### *KICKBACKS*

71. Defendants Barbara O'Dare, James O'Dare and Donald Geer, through Defendant Genesis Global Healthcare and many other related corporate entities, are engaged in a kickback scheme which results in the submission of false claims to the United States and certain states, by paying physicians to refer patients to their vascular centers for the provision of some of the most

expensive PAD treatments available.  In so doing, Defendants Barbara O'Dare, James O'Dare

and Ronald Geer entice physicians to put their own profit motive ahead of the patients' best

interests, WHILE ALSO causing patients to receive medically unnecessary treatments.

72.      Through Defendant Genesis Global Healthcare and many other related corporate entities,

Defendants Barbara O'Dare, James O'Dare and Donald Geer use the promise of investment

profits to induce physicians to invest in clinics which add no value to the communities in which

they are established.  These Defendants use the lure of easy profits to divert the physician-

investors' patient referrals from established professional relationships to create a revenue stream

from which these Defendants and their physician-investors profit handsomely.

73.      Defendants Barbara O'Dare, James O'Dare and Donald Geer offer physician-investors

the ability to profit from the referral of patients through majority ownership in a purported

vascular center – to which physician-investors then refer patients.  Defendants Barbara O'Dare,

James O'Dare and Donald Geer's offer of an opportunity to earn money constitutes

"remuneration" under the AKS.

74.      When Defendants Barbara O'Dare, James O'Dare and Donald Geer decide to establish a

purported vascular center in a new market, they recruit local physicians – mainly podiatrists and

cardiologists – who often refer PAD patients to vascular experts for treatment.  These physicians

are in a position to refer potential PAD patients for treatment, which is why Defendants Barbara

O'Dare, James O'Dare and Donald Geer target them.

75.      Through Defendant Genesis Global Healthcare and many other related corporate entities,

Defendants Barbara O'Dare, James O'Dare and Donald Geer induce a group of physicians to

invest in a limited liability company that rents space for a purported vascular center.  Defendants

Barbara O'Dare, James O'Dare and Donald Geer tell the physician-investors to refer their

potential PAD patients to the purported vascular center for treatments, which treatments are oftentimes then performed by a physician-investor. Defendants Barbara O'Dare, James O'Dare and Donald Geer tell the physicians they will receive a portion of the revenues, derived from the treatment of patients they referred, through profit distributions from the company in which they are investors.

76.     Because Defendants Barbara O'Dare, James O'Dare and Donald Geer's stable of physician-investors constitute an essentially guaranteed referral stream, their entry into a particular community is a zero-sum proposition: the physician-investors profit from their existing patient load because they refer, in essence, to their own new purported vascular center, and the physicians and practices to which they previously referred their patients suffer a loss of referrals. Defendants Barbara O'Dare, James O'Dare and Donald Geer's manipulation of the marketplace for their own profits and at the expense of patient care reflects precisely the abuse which the AKS was intended to combat.

77.     As noted, Defendants Barbara O'Dare, James O'Dare and Donald Geer effect their kickback scheme through Defendant Genesis Global Healthcare and a series of related companies. Physician-investors together own 90% of a purported vascular center in a particular community and thus receive 90% of its profit. Defendants Barbara O'Dare, James O'Dare and Donald Geer, through a corporate entity, own the other 10% of the purported vascular center, receiving 10% of the profit distributions; however, the Operating Agreement gives Defendants Barbara O'Dare, James O'Dare and Donald Geer absolute control over most business decisions. Defendants Barbara O'Dare, James O'Dare and Donald Geer also take a portion of revenues as a "management fee."

78.     The profits remitted to the physician-investors increase with the volume of patients referred to the purported vascular center.  By offering physicians the ability to profit in a manner that takes into account the volume and value of their referrals to the clinics, Defendants Barbara O'Dare, James O'Dare and Donald Geer and their affiliated entities violate the AKS.  The physician-investors also violate the AKS by accepting remuneration from Defendants Barbara O'Dare, James O'Dare and Donald Geer and their affiliated entities for referring their patients to the purported vascular centers.  Claims knowingly submitted to federal and state healthcare programs in violation of the AKS are non-payable and constitute false claims under the FCA and its state-law equivalents.

79.     In or around 2015, Defendants Barbara O'Dare, James O'Dare and Donald Geer approached numerous potential physician-investors in the Savannah, Statesboro and Pooler areas about investing in a purported vascular center.  These physicians included, among others, Defendant Abraham Lin, Defendant Todd Becker, Defendant Howard Gale, Defendant Brian Moogerfield, Defendant David Nabert, Defendant Todd Newsom, Defendant Stanley Shin, and Defendant Leonard Talarico, each of whom became investors in Defendant Genesis Vascular of Pooler, LLC.

80.     Defendants Barbara O'Dare, James O'Dare and Donald Geer revealed to the physician-investors in the Savannah/Statesboro/Pooler area details regarding their other purported vascular centers.  Defendants Barbara O'Dare, James O'Dare and Donald Geer represented to the physician-investors in the Savannah/Statesboro/Pooler area that the proposed Pooler center would operate like earlier ventures.  Defendants Barbara O'Dare, James O'Dare and Donald Geer also represented to physician-investors that their purported vascular centers operated under similar arrangements.

Page 18 of 27

81.     The business model implemented through Genesis Vascular of Pooler, LLC by
Defendants Barbara O'Dare, James O'Dare, Donald Geer and the physician-investor Defendants
included the following activities: (a) the physician-investors would refer patients to Genesis
Vascular of Pooler, LLC for invasive procedures of the peripheral arteries; (b) returns on the
physician-investors' investment would be determined by the number of referrals made to the
purported vascular center; (c) physician-investors would secure additional referrals from non-
investing physicians (usually other podiatrists) by providing incentives and gratuities to the non-
investing physicians, including the free use of diagnostic devices and services; and (d)
physician-investors would secure additional patients by providing them with incentives and
gratuities, including non-collection of co-payments and free transportation to the vascular center.

82.     Defendant physician-investors executed an Operating Agreement for Genesis Vascular of
Pooler, LLC in 2015.  The Operating Agreement confirmed that the physician-investors held up
to a 90% interest in Defendant Genesis Vascular of Pooler, LLC.  The Operating Agreement also
identified Defendant Genesis Healthcare Management, LLC as the Manager of Genesis Vascular
of Pooler, LLC, and as holding a 10% interest in Genesis Vascular of Pooler, LLC.  Defendant
James O'Dare signed the Operating Agreement on behalf of Genesis Healthcare Management,
LLC.

83.     On or about June 24, 2015, Genesis Vascular of Pooler, LLC entered into a lease of
commercial space at 1000 Towne Center Boulevard, Building 400, Pooler, Georgia, its current
site of operations.  Each individual physician-investor was required to be a guarantor of the
lease, in an amount equal to their pro rata percentage of ownership in Genesis Vascular of
Pooler, LLC.

84.     Defendant Genesis Vascular of Pooler, LLC began treating patients in January of 2016, including large numbers of Medicare, Medicaid, TRICARE and FEHBP patients.  Since then, Genesis Vascular of Pooler, LLC's physician-investors have received monthly and quarterly updates (purportedly from Defendant Genesis Global Healthcare) on the number of interventional vascular procedures.  The updates identify the patient, referring physician, date of service, procedure, performing physician, insurance, and other information.

85.     Many of the physician-investor Defendants in Defendant Genesis Vascular of Pooler, LLC already had existing relationships with an independent vascular institute in Savannah.  Between 2011 and 2015, these physicians previously referred numerous vascular patients to the independent vascular institute in Savannah.  Of those patients, approximately 74% were insured by Medicare and Medicaid.

86.     When Genesis Vascular of Pooler, LLC became operational, the physician-investor Defendants virtually ceased referring certain patients to the independent vascular institute in Savannah.  This differential demonstrates the power of kickbacks on the physician-investor referrals.

### *MEDICALLY UNNECESSARY PROCEDURES*

87.     After Genesis Vascular of Pooler became operational, the Defendants engaged in a systematic fishing expedition to find arteries to treat, particularly among patients who participated in the Medicare, Medicaid, TRICARE and FEHBP programs.

88.     Physician-investor Defendants ordered, read and conducted excessive ultrasounds and other diagnostic tests even when patients did not have corresponding symptoms.

89.     When tests revealed possible stenosis in patients' arteries, physician-investor Defendants and others over-estimated the severity of the potential blockage to justify lucrative interventions, including angioplasty, atherectomy and stent implantation.

90.     Physician-investor Defendants often failed to order and exhaust non-invasive therapies before performing invasive artery interventions.  Similarly, physician-investor Defendants often failed to rule out alternative, non-vascular causes of patients' symptoms before performing invasive peripheral artery interventions.

91.     Upon information and belief, physician-investor Defendants habitually failed to document the clinical need for the peripheral artery interventions that were performed so frequently.  For example, physician-investor Defendants regularly failed to properly document relevant medical histories and symptoms supporting invasive treatments, including debilitating claudication and critical limb ischemia.

92.     The physician-investor Defendants' gross overutilization of the Medicare, Medicaid, TRICARE and FEHBP programs significantly deviated from what these programs – and from what other cardiovascular specialists – consider medically reasonable, appropriate and necessary.

**Patient Example #1**

93.     GH, a Medicare/Medicaid beneficiary and dialysis patient, was seen by a physician-investor Defendant for treatment of a nail wound.  The physician-investor Defendant performed an unnecessary diagnostic test upon GH, then referred GH to Defendant Genesis Vascular of Pooler, LLC for vascular intervention.

94.     GH was offered free transportation by Defendant Genesis Vascular of Pooler, LLC from her home in Brooklet, Georgia to the Pooler center; then from the Pooler center to her dialysis

treatment in Statesboro. Skeptical of the proposed treatment and arrangement, GH's dialysis nurse requested a second opinion regarding the proposed vascular intervention. A second opinion confirmed that the proposed vascular intervention at Defendant Genesis Vascular of Pooler, LLC was not medically necessary.

**Patient Example #2**

95.    MC, a Medicare beneficiary and a Stage-4 lung cancer patient, was referred to Defendant Genesis Vascular of Pooler, LLC, where she was subjected to multiple, medically unnecessary arterial interventions. The initial unnecessary revascularization procedures performed at Defendant Genesis Vascular of Pooler, LLC predictably worsened MC's vascular condition.

96.    After her last arterial intervention, performed by Defendant Lin, MC collapsed at Defendant Genesis Vascular of Pooler, LLC. Defendant Lin had already left the facility and Defendant Genesis Vascular of Pooler's only option was to call 911. An ambulance later transported MC to St. Joseph's/Candler Hospital in Savannah. There, doctors performed limb-saving procedures on MC. Defendant Lin, who had no privileges at any of the hospitals surrounding Defendant Genesis Vascular of Pooler, LLC, was unavailable to discuss MC's treatment with any of the physicians at St. Joseph's/Candler.

**Patient Example #3**

97.    JS, a Medicare beneficiary, was evaluated by physicians at a Savannah vascular institute for PAD. Based upon a comprehensive examination and non-invasive testing, no intervention was indicated.

98.    JS was next seen for an unrelated condition by a Savannah podiatrist, who, upon information and belief, had been provided unlawful gratuities by Defendants in the form of the free use of diagnostic equipment. The Savannah podiatrist unjustifiably repeated PAD screening

measures, which were then improperly read as abnormal. Next, JS was referred to Defendant Genesis Vascular of Pooler, LLC for vascular intervention.

99.     Uncomfortable with his referral to Defendant Genesis Vascular of Pooler, LLC, JS re-visited his physician at the Savannah vascular institute. There, JS's most recent screening tests were properly interpreted as normal, and JS was informed that the proposed vascular intervention by Defendant Genesis Vascular of Pooler, LLC was medically unnecessary.

**Patient Example #4**

100.    SR, a FEHBP beneficiary, was evaluated by a Savannah podiatrist for symptoms related to varicose veins. The Savannah podiatrist, upon information and belief, had been provided unlawful gratuities by Defendants. Despite no arterial symptoms, SR was referred by the Savannah podiatrist to Genesis Vascular of Pooler, LLC for arterial interventions.

101.    Defendant Genesis Vascular of Pooler, LLC paid to transport SR to its facility from her home in Richmond Hill, Georgia. While at Genesis Vascular of Pooler, SR underwent a purported evaluation; then underwent invasive and medically unnecessary arterial interventions, including a left leg angioplasty and atherectomy. Defendant Genesis Vascular of Pooler billed $31,017.00 for the invasive arterial interventions. Later, Defendant Genesis Vascular of Pooler, LLC attempted to coax SR into right-leg interventions, but SR refused.

**Patient Example #5**

102.    MS, a State of Georgia health benefit plan member, was referred to Defendant Todd Becker for treatment of an ingrown toenail. During her initial visit with Defendant Becker, MS was screened for PAD. Next, Defendant Becker called Defendant Lin while MS was still in Becker's office, then advised MS to see Defendant Lin at his Statesboro Cardiology PC office.

103.   Within a few days, MS was seen by Defendant Lin at Statesboro Cardiology PC. During

his evaluation, Defendant Lin informed MS that she was in need of vascular intervention and

that he performed his interventions at Genesis Vascular of Pooler.

104.   Over the next several months, Defendant Lin performed on MS medically-unnecessary

vascular intervention after medically-unnecessary vascular intervention, all at Defendant Genesis

Vascular of Pooler LLC, and all to the detriment of MS. Ultimately, because of the highly

invasive and harmful procedures performed by Defendant Lin, MS was required to undergo

arterial by-pass surgery on her lower extremity, performed by a vascular expert.

**Patient Example #6**

105.   PT, a Medicare beneficiary, was a patient of a Statesboro cardiologist.

106.   PT was next seen for an unrelated condition by a Statesboro podiatrist, who, upon

information and belief, had been provided unlawful gratuities by Defendants. The Statesboro

podiatrist unjustifiably ordered PAD screening measures, which were then improperly read as

abnormal. Next, PT was referred to Defendant Lin regarding vascular intervention.

107.   Uncomfortable with her referral to Defendant Lin, PT re-visited her Statesboro

cardiologist. There, PT's screening tests were properly interpreted as normal, and PT was

informed that vascular intervention was medically unnecessary.

**Patient Example #7**

108.   RP, a Medicare beneficiary, was referred to Defendant Genesis Vascular of Pooler, LLC

by Defendant Lin, where he was subjected to multiple, medically unnecessary arterial

interventions. Later, Defendant Genesis Vascular of Pooler, LLC attempted to coax RP into

additional interventions, but RP refused. The unnecessary revascularization procedures

performed at Defendant Genesis Vascular of Pooler, LLC predictably provided no relief to RP's condition.

## COUNT I
### FALSE CLAIMS- 31 U.S.C. §3729(a)(1)(A)

109.    The allegations of all the preceding paragraphs in this Complaint are hereby incorporated by reference.

110.    By the acts described above, Defendants violated the FCA by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval.

111.    Defendants individually by and through their own acts, or through the acts of their agents, servants, officers and employees, knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

112.    Because of the Defendants' conduct, the United States has been damaged, and continues to be damaged, in an amount equal to the entire amount paid by the Government to Defendants.

## COUNT II

### FALSE STATEMENTS- 31 U.S.C. §3729(a)(l)(B)

113.    The allegations of all preceding paragraphs in this Complaint are hereby incorporated by reference.

114.    In performing the acts described above, Defendants individually by and through their own acts, or through the acts of their agents, servants, officers and employees, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(l)(B).

115.    Because of the Defendants' conduct, the United States has been damaged, and continues to be damaged, in an amount equal to the entire amount paid by the Government to Defendants.

## COUNT III

### GEORGIA FALSE CLAIMS ACT - O.C.G.A. § 49-4-168.1

116.    The allegations of all preceding paragraphs in this Complaint are hereby incorporated by reference.

117.    By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or misrepresentation for use in determining rights to a benefit or payment under the Georgia Medicaid Program. O.C.G.A. § 49-4-168.1.

### PRAYER FOR RELIEF

**WHEREFORE, Plaintiff, the United States of America**, through the Relators, requests the Court for entry of judgment against Defendants and the following relief:

A.    Defendants cease and desist from further violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

B.    For violations of the Federal False Claims Act, 31 U.S. C. §3729, *et seq.*, this Court enter Judgment against the Defendants, jointly and severally, in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted or committed, and the costs of this action, with interest, including the costs to the United States Government and Relators for their expenses related to this action;

C.    Pursuant to section 3730(d) of the False Claims Act, that the Relators be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages allowed under applicable law;

D.  That Relators be awarded all costs of this action, together with all expert witness fees, attorneys' fees, and court costs, as fully as is allowed by law pursuant to 31 U.S.C. § 3730(d).

E.  That the United States Government and the Relators receive all relief, both in law and in equity, to which they may reasonably appear entitled to.

**WHEREFORE, Plaintiff, the State of Georgia**, through the Relators, requests the Court for entry of judgment against Defendants and the following relief:

A.  For violations of the Georgia Medicaid False Claims Act, this Court enter Judgment against the Defendants, jointly and severally, in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each false or fraudulent claim submitted or committed, and the costs of this action, with interest, including the costs to the State of Georgia and Relators for their expenses related to this action.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, a jury trial is demanded.

Respectfully submitted on this 29th day of May, 2018.

SAVAGE, TURNER, DURHAM, PINCKNEY & SAVAGE

By: _____

James D. Durham
Member, SD GA Bar
Georgia Bar No. 235515
102 East Liberty Street
Savannah, GA 31401
T: 912-231-1140
F: 912-232-4212
jdurham@savagelawfirm.net

*Attorneys for Plaintiff-Relators*