**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

UNITED STATES OF AMERICA, et al.,

        Plaintiffs,

    v.

GENESIS GLOBAL HEALTHCARE, et al.,

        Defendants.

CIVIL ACTION NO.: 4:18-cv-128

## O R D E R

This is a *qui tam* action in which Jerry Cohn Jr., M.D., and Sharon Bell bring suit as Relators on behalf of the United States under the False Claims Act (the "FCA") and on behalf of the state of Georgia under the Georgia False Medicaid Claims Act (the "GFMCA").[1]  Relators bring suit against Defendants Genesis Vascular of Pooler, LLC ("GVP");[2] Genesis Global Healthcare, LLC ("Genesis Global"); Genesis Healthcare Management, LLC ("Genesis Management"); Genesis Vascular, LLC; Statesboro Cardiology, P.A.; James O'Dare; Barbara O'Dare; Donald Geer; Sean Yanes; Dr. Abraham Lin; C3 of Bulloch, Inc.; Dr. Stanley J. Shin; Alexis M. Shin, as trustee of the Stanley J. Shin Family Trust (the "Trust"); Dr. Todd Newson; Dr. Howard Gale; Dr. Leonard Talarico; Pooler Property Holdings, LLC; Dr. David Nabert; and Dr.

---

[1]  The FCA allows a private person, known as a relator, to bring an FCA suit on behalf of the United States in a *qui tam* action.  31 U.S.C. § 3730(b)(1).  A relator serves the United States with a copy of the complaint, and the United States then has sixty days to intervene and proceed with the action once served.  If the United States does not intervene, the relator individually may proceed with the action.  Id. § 3730(b)(4).  Similarly, the GFMCA permits a private person to act as a relator on behalf of the state of Georgia and continue with the suit even after the state of Georgia declines to intervene.  See O.C.G.A. § 49-4-168.2(b), (f).

[2]  Relators voluntarily dismissed their claims against GVP without prejudice on February 16, 2021.  (Doc. 112.)

Todd Becker for alleged violations of the FCA and the GFMCA.  (See doc. 32.)  Specifically, in the Amended Complaint, Relators allege that Defendants violated the FCA and GFMCA by participating in an illegal fraud scheme with the purpose of inducing patient referrals to a medical clinic owned and operated by Defendants and then billing federal and state healthcare programs for false claims generated by that scheme.  (See generally id.)

Presently before the Court are Motions to Dismiss the Amended Complaint filed by Defendants Gale and Becker, (docs. 72, 73); Defendants C3 of Bulloch, Abraham Lin, David Nabert, the Trust, Stanley J. Shin, and Statesboro Cardiology, (doc. 74); Defendants Pooler Property Holdings and Talarico, (doc. 75); Defendant Geer, (doc. 80); and Defendants Genesis Global, Genesis Management, Genesis Vascular, Barbara O'Dare, and James O'Dare, (doc. 81).[3] While Defendants filed separate Motions to Dismiss, most of their arguments for dismissal are nearly identical: that the Amended Complaint failed to plead with sufficient particularity that Defendants engaged in an illegal fraud scheme or possessed the requisite scienter; that the Amended Complaint improperly commingled Defendants and failed to sufficiently allege each Defendant's participation in the alleged fraud scheme; that the Amended Complaint amounts to an improper shotgun pleading; and that the Amended Complaint failed to state any claim under the FCA or GFMCA.  (See generally docs. 72, 73, 74-1, 75-1, 80, 81.)  Relators filed Responses to each Motion to Dismiss, (docs. 87, 88, 89, 96, 98), and Defendants filed Replies, (docs. 99, 100, 101, 102, 105).

---

[3]  In their Motion to Dismiss, Genesis Global, Genesis Management, Genesis Vascular, Barbara O'Dare, and James O'Dare adopted and incorporated the arguments and legal authorities contained in the Motions to Dismiss filed by the other Defendants.  (Doc. 81, p. 2.)

# BACKGROUND

## I.    Applicable Law

### A.    The False Claims Act

The FCA permits private persons (or "relators") to file a form of civil action (known as *qui tam*) on behalf of the United States against any person who: (1) "knowingly presents, or causes to be presented, a false or fraudulent claim" to the government (the "presentment" provision); (2) knowingly makes, uses, or causes to be made or used, a false statement to cause the government to pay a claim (the "make-or-use" provision); or (3) knowingly makes or causes to be made a false record or statement to decrease an obligation to pay the government (the "reverse false claim" provision).  31 U.S.C. § 3729(a)(1)(A), (B), (G); see also United States ex rel. Clausen v. Lab'y Corp. of Am., Inc., 290 F.3d 1301, 1307 (11th Cir. 2002); United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 696 (11th Cir. 2014).  The FCA also prohibits any person from "conspir[ing] to commit a violation" of the presentment, make-or-use, or reverse false claim provisions.  31 U.S.C. § 3729(a)(1)(C).

Concerning scienter, the FCA defines "knowledge" and "knowingly" as either "actual knowledge," "deliberate ignorance," or "reckless disregard."  United States ex rel. Phalp v. Lincare Holdings, Inc., 857 F.3d 1148, 1155 (11th Cir. 2017) (quoting 31 U.S.C. § 3729(b)).  The FCA's scienter requirement is "rigorous."  Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 2002 (2016).  While the FCA does not require "'specific intent to defraud,' relators proceeding under the false certification theory must allege that the defendant knew or should have known that its conduct violated regulations or statutes."[4]  Wallace, 2020 WL 4500493, at *16 (citing Phalp, 857 F.3d at 1154–55).

---

[4]  Under the "false certification" theory of FCA liability, "liability may arise where a defendant falsely asserts or implies that it has complied with a statutory or regulatory requirement when, in actuality, it has not so complied."

**B.      The Anti-Kickback Statute and the Stark Act**

Because compliance with the Anti-Kickback Statute ("AKS") and the Stark Act is a "condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes can form the basis of liability under the F[CA]." United States v. Marder, 208 F. Supp. 3d 1296, 1316 (S.D. Fla. 2016) (citation omitted) (alteration in original).  The AKS prohibits: (1) knowingly soliciting or receiving remuneration in exchange for "referring an individual to a person for the furnishing . . . of any . . . service for which payment may be made in whole or in part under a Federal healthcare program," 42 U.S.C. § 1320a-7b(b)(1); and (2) knowingly offering or providing remuneration for the purpose of inducing the recipient to purchase a good or service for which payment may be made under a federal health care program, such as Medicare and Medicaid, 42 U.S.C. § 1320a-7b(b)(2); see also United States v. Ruan, 966 F.3d 1101, 1144 (11th Cir. 2020) (describing Medicare and Medicaid as "common examples" of a "federal health care program" under the AKS.  AKS defines "remuneration" as "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind." Ameritox, Ltd. v. Millennium Labs, Inc., 803 F.3d 518, 521–22 (11th Cir. 2015) (quoting 42 U.S.C. § 1320a-7b(b)).

"To violate the AKS, the defendant must act 'knowingly and willfully.'"  United States ex rel. Heller v. Guardian Pharmacy, LLC, 1:18-cv-03728-SDG, 2021 WL 488305, at *14 (N.D. Ga. Feb. 10, 2021) (quoting 42 U.S.C. § 1320a-7b(b)).  While a defendant must "act with knowledge that his conduct was unlawful," United States ex rel. McFarland v. Fla. Pharm. Sols., 358 F. Supp. 3d 1316, 1329 (M.D. Fla. 2017) (quoting United States v. Starks, 157 F.3d 833, 838–39 (11th Cir. 1998)), "a person need not have actual knowledge of [the AKS] or specific intent to commit a

---

United States ex rel. Wallace v. Exactech, Inc., 2:18-cv-01010-LSC, 2020 WL 4500493, at *16 (N.D. Ala. Aug. 5, 2020) (citing United States v. AseraCare, Inc., 938 F.3d 1278, 1284 (11th Cir. 2019)).

violation of [the AKS]" in order to do so, 42 U.S.C. § 1320a-7b(h).  Furthermore, though the AKS does not define "willfully," the Eleventh Circuit Court of Appeals has interpreted "willfully" to mean that "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids."  United States v. Vernon, 723 F.3d 1234, 1256 (11th Cir. 2013). However, a "person need not be aware of the specific law or rule that his or her conduct may be violating."  Id.  Indeed, the Eleventh Circuit has held that the AKS "is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct.  Rather, the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal."  Id. (internal quotations and citations omitted).

In comparison to the AKS, the Stark Act prohibits a physician who has a "financial relationship" with an entity from referring Medicare and Medicaid patients to that entity to receive "designated healthcare services."  See 42 U.S.C. § 1395nn(a)(1)(A); see also United States v. Halifax Hosp. Med. Ctr., No. 6:09-cv-1002-Orl-31TBS, 2013 WL 6017329, at *4 (M.D. Fla. Nov. 13, 2013) ("[The Stark Act] . . . prohibit[s] physicians from referring their Medicare and Medicaid patients to business entities in which the physicians or their immediate family members have a financial interest.").  The Stark Act also prohibits a healthcare entity from "present[ing] or caus[ing] to be presented" Medicare or Medicaid claims "for designated health services furnished pursuant to a referral prohibited under [42 U.S.C. § 1395nn(a)(1)(A)]."  42 U.S.C. § 1395nn(a)(1)(B).

C.       The Georgia False Medicaid Claims Act

Similar to the FCA, the GFMCA imposes liability on any person who: (1) "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;" (2) "[k]nowingly makes, uses, or causes to be made or used a false record

or statement to a false or fraudulent claim;" or (3) "[k]nowingly makes . . . or causes to be made . . . a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay . . . money to the Georgia Medicaid program." O.C.G.A. § 49-4-168.1(a)(1), (2), (7). The GFMCA also holds liable any person who conspires to commit a violation of the GFMCA's presentment, make-or-use, or reverse false claim provisions. O.C.G.A. § 49-4-168.1(a)(3).

"Although Georgia courts have had very little occasion to address the provisions of the GFMCA," the Georgia Court of Appeals "has noted that '[t]he statutory language in the GFMCA . . . mirrors the language in the [FCA]." Hill v. Bd. of Regents of the Univ. Sys. of Ga., 829 S.E.2d 193, 198 (Ga. Ct. App. 2019); see also Jordan v. State, 785 S.E.2d 27, 31 (Ga. Ct. App. 2016) ("We have found no Georgia appellate cases addressing claims made under the GFMCA, although the body of federal law interpreting the almost-identical [FCA] is extensive."). Thus, "[Georgia] courts generally look to federal case law to decide issues under the GFMCA." Murray v. Cmty. Health Sys. Pro. Corp., 811 S.E.2d 531, 537 (Ga. Ct. App. 2018); see also Reddick v. Jones, No. 1:14-CV-0020-AT, 2015 WL 1519810, at *6 (N.D. Ga. Mar. 11, 2015) (applying federal law to GFMCA claims). Therefore, "claims under the GFMCA must also satisfy [Federal Rule of Civil Procedure] 9(b)." Cade v. Progressive Cmty. Healthcare, Inc., No. 1:09-cv-3522-WSD, 2011 WL 2837648, at *3 (N.D. Ga. July 14, 2011).

## II.   Factual Allegations

### A.   Formation of the Genesis Entities and Genesis Vascular-Pooler

In December 2014, Defendants James O'Dare, Barbara O'Dare, Donald Geer, and Sean Yanes—whom the Amended Complaint identifies together as the "Genesis Individual

Defendants"—formed what Relators call the "Genesis Entities," a group that includes GVP, Genesis Vascular, Genesis Global, and Genesis Management.  (Doc. 32, p. 28.)  According to the Amended Complaint, the purpose of the Genesis Entities was to create "a structure by which the Genesis Individual Defendants could operate vascular centers across the country."  (Id.)  As part of that structure, the Genesis Individual Defendants sought to create a vascular surgical center in Pooler, Georgia, which ultimately became GVP.  (Id.)

To form GVP, the Genesis Individual Defendants recruited medical physicians in the greater Savannah area as investors.  (Id.)  According to the Amended Complaint, the Genesis Individual Defendants targeted cardiologists and podiatrists because they treat a high volume of patients with diseases that routinely impair vascular function and, thus, were in the best position to refer patients to GVP.  (Id.)  The Genesis Individual Defendants explained to all prospective investors that a $100,000 investment would yield a $175,000 return per year and that the prospective investors could reap "financial benefits" if they referred patients "to an entity in which [they possessed] an ownership interest, rather than . . . referring patients out to third parties."  (Id. at pp. 28–29.)  Ultimately, the Genesis Individual Defendants successfully recruited Defendants Dr. Abraham Lin, Dr. Stanley J. Shin, Dr. Todd Newsom, Dr. Howard Gale, Dr. Leonard Talarico, Dr. David Nabert, and Dr. Todd Becker as investors, a group the Amended Complaint refers to as the "Physician Investors."[5]  (Id. at pp. 8, 29.)  The Physician Investors collectively owned eighty-eight percent of GVP, and Genesis Vascular owned the remaining interest.  (Id. at p. 29.)

---

[5]  Becker, Talarico, Gale, and Newsom are podiatrists licensed to practice medicine in Georgia, and Lin, Shin, and Nabert are cardiologists licensed to practice in Georgia.  (Doc. 32, pp. 6–8.)  Lin, Shin, and Nabert practice cardiology at Defendant Statesboro Cardiology.  (Id.)  Lin also served as the lead interventionist at GVP.  (Id. at p. 37.)

### B.     Fraudulent Scheme

#### 1.     Alleged AKS Violations

The Amended Complaint alleges that the Physician Investors, Genesis Individual Defendants, and Genesis Entities engaged in a multi-pronged fraud scheme through their involvement with GVP.  The first prong of the fraud scheme stems from the Physician Investors' financial investments in and subsequent patient referrals to GVP.  According to the Amended Complaint, the Physician Investors' financial investments in GVP created a kickback scheme by which the Physician Investors would refer patients to GVP for vascular procedures in exchange for profit distributions and "other payments" from GVP.  (Id. at pp. 29–30.)  GVP would then file claims with Medicare and Medicaid, seeking reimbursements for services rendered to those referred patients.  (Id. at p. 37.)  The Amended Complaint asserts that this scheme violated the AKS and, in turn, the FCA.  (Id.)

Specifically, the Amended Complaint alleges that from January 2016 to April 2020, GVP received over $4.3 million in Medicare claim payments and that from August 2016 to June 2018, GVP received $337,456.95 in Medicaid reimbursements.  (Id. at pp. 37–38.)  Furthermore, many of these claims stemmed from patients referred to GVP by the Physician Investors.  (Id. at p. 42.)  According to the Amended Complaint, GVP filed and received Medicare payments for over $606,000 on claims referred by Gale, $380,000 on claims referred by Becker, $266,000 on claims referred by Shin, $122,000 on claims referred by Nabert, $104,000 on claims referred by Talarico, $21,000 on claims referred by Newsom, and $17,000 on claims referred by Lin.[6]  (Id.)  Relators attached two exhibits to the Amended Complaint that provide non-exhaustive lists of specific claims GVP submitted to Medicare and Medicaid based on patient referrals from the Physician

---

[6]   The Amended Complaint also alleges that the Physician Investors ensured that other medical professionals employed in their medical practices referred their patients to GVP as well.  (Doc. 32, p. 43.)

Investors.  (Docs. 32-1, 32-2.)  In exchange for these patient referrals, GVP issued profit distributions to the Physician Investors.  According to the Amended Complaint, GVP used these profit distributions to reward Physician Investors for past patient referrals and to induce future patient referrals.  (Doc. 32, p. 49.)  From May 2017 to November 2018, GVP distributed $700,000 in profits to Genesis Vascular and each of the Physician Investors.  (Id.)

Moreover, the Amended Complaint alleges that the Physician Investors engaged in "systematic fishing expedition[s]" so that they could refer more patients to GVP.  (Id. at p. 53.) Specifically, the Physician Investors performed unnecessary or overly invasive tests on patients and then referred those patients to Defendant Lin, who was not only an investor in GVP but also operated as GVP's lead interventionist.  (Id. at pp. 53–55.)  Defendant Lin then performed a "high number of invasive and medically unnecessary" procedures.  (Id. at p. 37.)  These medically unnecessary procedures resulted in a "gross overutilization" of the Medicare and Medicaid programs.  (Id. at 54.)  To support these allegations, Relators describe seven examples of the Physician Investors recommending or performing purportedly unnecessary medical tests and/or procedures on patients.  (Id. at pp. 54–58.)

### 2.    Alleged Stark Act Violations

The Amended Complaint also alleges that Defendants violated the Stark Act and, thus, the FCA.  According to the Amended Complaint, Lin, Gale, Talarico, and Newsom referred patients to GVP—in which they each held a financial interest—for medical procedures that qualify as "designated health services" under the Stark Act.  (Id. at pp. 51–52.)  Lin and GVP then filed claims with Medicare for those services.  (Id. at p. 51.)  Relators attached Exhibit C, (doc. 32-3), to the Amended Complaint, which purportedly lists claims GVP submitted to Medicare for such procedures.

Moreover, Relators allege that Defendant Statesboro Cardiology and GVP engaged in a "billing scheme that disguised the location of certain billings that [GVP] could not make without violating the Stark [Act]'s prohibition against self-referral of designated services." (Doc. 32, p. 47.)   According to the Amended Complaint, Talarico referred patients to GVP for medical procedures that qualify as "designated health services" under the Stark Act. (Id.)  Defendant Lin, as lead interventionist at GVP, then performed those procedures on the patients or, alternatively, referred those patients to Statesboro Cardiology to undergo those procedures. (Id.)  However, according to the Amended Complaint, regardless of whether Lin performed those procedures at GVP or referred the patients to Statesboro Cardiology, Statesboro Cardiology billed Medicare for those services. (See id. at p. 48.)  Relators assert that this scheme violated either the FCA directly or, alternatively, the Stark Act (which, in turn, led to an FCA violation). (Id. at p. 47–48.) Specifically, if Lin in fact performed the procedures at GVP but billed the claims to federal and state healthcare programs through Statesboro Cardiology, then the associated claims must have falsely stated the location of service, rendering the claims in violation of the FCA. (Id. at p. 48.) On the other hand, if Lin referred the procedures to Statesboro Cardiology and Statesboro Cardiology performed those procedures, then the associated claims violated the Stark Act's prohibition against self-referrals because Lin would have referred patients to Statesboro Cardiology, where Defendant Lin holds his principal office. (Id. at pp. 6, 48.)  Thus, according to the Amended Complaint, Statesboro Cardiology, "by and through Dr. Lin, Dr. Shin, and Dr. Nabert, was a critical participant and conspirator in Defendants' schemes to submit false claims in violation of the AKS, Stark [Act], and FCA." (Id. at p. 48.)

### III.     Procedural Background

Relators Jerry Cohn, Jr., and Sharon Bell initially filed this action on May 29, 2018.  (Doc. 3.)  After the United States and the state of Georgia declined to intervene, (docs. 24, 25), the Court unsealed the initial Complaint, (docs. 30, 31), and Relators filed an Amended Complaint, (doc. 32).  In the Amended Complaint, Relators assert eight separate claims: (1) an FCA presentment clause claim under 31 U.S.C. § 3729(a)(1)(A); (2) an FCA make-or-use clause claim under 31 U.S.C. § 3729(a)(1)(B); (3) an FCA conspiracy claim under 31 U.S.C. § 3729(a)(1)(C); (4) an FCA reverse false claim action under 31 U.S.C. § 3729(a)(1)(G); (5) a GFMCA claim under O.C.G.A. § 49-4-168.1(a)(1); (6) a GFMCA claim under O.C.G.A. § 49-4-168.1(a)(2); (7) a GFMCA conspiracy claim under O.C.G.A. § 49-4-168.1(a)(3); and (8) a GFMCA claim concerning reverse false claims under O.C.G.A. § 49-4-168.1(a)(7).  (Doc. 32, pp. 60–64.)

Defendants Howard Gale, Todd Becker, C3 of Bulloch, Inc., Abraham Lin, David Nabert, the Trust, Stanley J. Shin, Statesboro Cardiology, Pooler Property Holdings, Leonard Talarico, Donald Geer, Genesis Global, Genesis Management, Genesis Vascular, Barbara O'Dare, and James O'Dare filed Motions to Dismiss the Amended Complaint.  (Docs. 72, 73, 74, 75, 80, 81.) Relators filed Responses to each Motion to Dismiss, (docs. 87, 88, 89, 96, 98), and the moving Defendants filed Replies, (docs. 99, 100, 101, 102, 105).

### DISCUSSION

### I.     General Pleading Deficiencies

### A.     Shotgun Pleading

Defendants first argue that the Amended Complaint is due to be dismissed because it is an improper shotgun pleading.  (Doc. 72, pp. 15–16; doc. 73, pp. 15–16; doc. 74-1, pp. 7–8; doc. 75-1, p. 3; doc. 80, pp. 20–21.)  While Relators acknowledge that the "[Amended] Complaint's claims

incorporate all preceding allegations into their terms," Relators argue that "such a technical violation" does not warrant the dismissal of the Amended Complaint because Defendants "have a sufficient understanding" of the claims alleged against them, the "particulars" of the fraud, and their role in the scheme. (Doc. 87, p. 17.)  Relators also contend that if the "Court determines that re-pleading is necessary," then it should allow them an opportunity to file a second amended complaint. (Id. at p. 18.)

"A district court has the inherent authority to control its docket and ensure the prompt resolution of lawsuits, which includes the ability to dismiss a complaint on shotgun pleading grounds."  Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1295 (11th Cir. 2018) (internal quotations omitted).  Shotgun pleadings are pleadings that violate either Federal Rule of Procedure 8(a)(2)[7] or Rule 10(b).[8]  Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1320 (11th Cir. 2015).  The Eleventh Circuit has identified "four rough types" of shotgun pleadings: (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts;" (2) a complaint that contains "conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) a complaint that fails to "separat[e] into a different count each cause of action or claim for relief;" and (4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."  Id. at 1321–23.  "The

---

[7]  Rule 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

[8]  Rule 10(b) requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances.  A later pleading may refer by number to a paragraph in an earlier pleading.  If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense." Fed. R. Civ. P. 10(b).

unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Id. at 1323. "Courts in the Eleventh Circuit have little tolerance for shotgun pleadings," Vibe Micro, Inc., 878 F.3d at 1295, as they "exact an intolerable toll on the trial court's docket . . . and impose unwarranted expense on the litigants [and] the court," Cramer v. Florida, 117 F.3d 1258, 1263 (11th Cir. 1997).

Here, the Amended Complaint shares several characteristics of a shotgun pleading. Specifically, Relators failed to identify the facts relevant to each claim, thereby "materially increas[ing] the burden of understanding the factual allegations underlying each count." Weiland, 792 F.3d at 1324. For example, in Count I, Relators allege that, "[b]y the acts described above, Defendants violated the False Claims Act," but Relators failed to describe which acts or facts alleged earlier in the Amended Complaint relate to that claim—a mistake Relators repeat in each of the other seven counts in the Amended Complaint. (Doc. 32, pp. 60–64.) Furthermore, each of the eight counts raised in the Amended Complaint expressly "incorporate[s] by reference" the allegations "of all the preceding paragraphs" of the Amended Complaint—a document that spans sixty-seven pages in length and contains 204 paragraphs of allegations (excluding the conclusory allegations made within each count). (Id.) No further reference is made to the previous allegations, "leaving the reader to wonder which prior paragraphs support the elements" of each count. Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1279 (11th Cir. 2006); see also Jackson v. Bank of Am., N.A., 898 F.3d 1348, 1354 (11th Cir. 2018) ("The amended complaint was, like its predecessor, a shotgun pleading: it incorporated all of the factual allegations into each count without delineating which allegations pertained to each count."); Ferrell v. Durbin, 311 F. App'x 253, 259 (11th Cir. 2009) ("In shotgun style pleading, the complaint incorporates all of the general

factual allegations by reference into each subsequent claim for relief. . . .  Appellants were required to clearly connect each factual allegation to the appropriate count in the complaint in order to satisfy Rule 9(b)."); United States v. Health First, Inc., No. 6:14-cv-501-Orl-37DAB, 2016 WL 3959343, at *4 (M.D. Fla. July 22, 2016) ("[A]ll seven counts of the Amended Complaint improperly incorporate by reference the same 192 paragraphs.  Further, only a very small fraction of those 192 paragraphs address[es] the purportedly actionable claims submitted to the U.S. and the State.  In short, the Amended Complaint does not satisfy the minimum pleading requirements for qui tam actions in this Court.") (internal citations omitted) (citing Weiland, 792 F.3d at 1320–23).

Finally, because each count incorporates "*all* the preceding paragraphs in th[e] [Amended] Complaint," (doc. 32, pp. 60–64 (emphasis added)), the allegations contained in each count are "rolled into every successive count on down the line." Weiland, 792 F.3d at 1324.  The Eleventh Circuit has described similar complaints as "quintessential shotgun pleadings." See Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 (11th Cir. 2002) (internal quotations omitted); see also Wagner, 464 F.3d at 1279 ("Shotgun pleadings are those that incorporate every antecedent allegation by reference into each subsequent claim for relief or affirmative defense.").  Indeed, such a complaint forces the Court to "sift out the irrelevancies, a task that can be quite onerous," Strategic Income Fund, 305 F.3d at 1295, and "wreak[s] havoc on the judicial system . . . [by] divert[ing] already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently," Wagner, 464 F.3d at 1279 (internal quotations and citations omitted).  Thus, the Court finds that Relators' Amended Complaint constitutes an improper shotgun pleading. See, e.g., Hickman v. Hickman, 563 F. App'x 742, 744 (11th Cir. 2014) ("The district court correctly concluded that Hickman's complaint was a shotgun

pleading because it repeated, re-alleged, and incorporated by reference all allegations, facts, and information about the parties in each subsequent allegation of her complaint."); United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., 972 F. Supp. 2d 1317, 1336 (N.D. Ga. 2013) ("Defendant correctly notes that Relator's Complaint is an impermissible shotgun pleading. Relator improperly incorporates all allegations into Counts 7 and 8, making it virtually impossible . . . to determine which allegations Relator believes actually support these counts."); United States v. Medco Health Sols., Inc., NO. 08-14201-CIV-GRAHAM/Lynch, 2010 WL 11444153, at *3 (S.D. Fla. July 21, 2010) ("[T]he Plaintiffs set forth general allegations in the 'factual allegations' section and appl[y] all of the aforementioned allegations to every claim regardless of its relevancy. With regard to these claims, Plaintiffs must re-draft their complaint . . . .").

Though Defendants request that the Court dismiss the Amended Complaint, Eleventh Circuit precedent mandates that the Court provide Relators "one chance to replead before dismissing [the] case with prejudice on non-merits shotgun pleading grounds." Vibe Micro, Inc., 878 F.3d at 1296. While Defendants argue that the case has been ongoing for over two years, their Motions to Dismiss are the first time the pleading deficiencies were presented to Relators. (Doc. 88, p. 26.) Thus, the Court affords Relators an opportunity to correct those deficiencies. Relators must file a comprehensive operative complaint, the details of which are set forth in the Conclusion section, infra. See, e.g., Estate of Bass v. Regions Bank, Inc., 947 F.3d 1352, 1358 (11th Cir. 2020) ("[T]he District Court should have struck the complaints and given Bass an opportunity to amend them . . . . But the Court did not do so. Therefore, once again, we are forced to review a judgment that should have never been entered.").

### B.    Collective Pleading

Defendants also move for dismissal under Rule 9(b), arguing that the Amended Complaint's collective pleading style failed to "properly differentiate their allegations and inform [them] of each of their alleged participation in the fraud."  (Doc. 72, p. 11; see also doc. 74-1, pp. 18–20; doc. 75-1, pp. 3–7; doc. 80, pp. 5–7.)  Relators respond that each Defendant has "been put on notice, with sufficient particularity, of the who, what, when, why, and how of their alleged fraud, as required by Rule 9(b)."  (Doc. 87, p. 12; see also doc. 88, pp. 8–12; doc. 89, pp. 8–10; doc. 96, pp. 8–12.)

"Fair notice is . . . the most basic consideration underlying Rule 9(b)."  Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1381 (11th Cir. 1997) (citations and quotations omitted).  Thus, "the plaintiff who pleads fraud must reasonably notify the defendants of their purported role in the scheme."  Id. (citations and quotations omitted).  In an FCA fraud case involving multiple defendants, a complaint must "inform each defendant of the nature of his alleged participation in the fraud."  Id. (quotations and citation omitted); see also Paws Holding, LLC v. Daikin Indus., Ltd., No. 1:16-cv-058, 2017 WL 706624, at *11 (S.D. Ga. Feb. 22, 2017) ("[I]n the context of a multiple defendant lawsuit, the Eleventh Circuit has only required the pleading of specific allegations as to each defendant's conduct when there are fraud allegations.").  Indeed, "a complaint fails to satisfy the Rule 9(b) pleading standard where it makes vague, collective allegations against defendants with different roles."  United States ex rel. Bibby v. Wells Fargo Bank, N.A., 906 F. Supp. 2d 1288, 1297 (N.D. Ga. 2012); see also United States ex rel. Lewis v. Cmty. Health Sys., Inc., No. 18-20394-Civ-Scola, 2020 WL 3103994, at *18 (S.D. Fla. June 11, 2020) ("In a case like this one, involving multiple defendants, 'with different actors playing different parts, it is not enough to 'lump' together the dissimilar defendants and assert that

'everyone did everything.'").  However, "[w]hen multiple defendants are named in a complaint, the allegations can be and usually are to be read in such a way that each defendant is having the allegation made about him individually." Paws Holding, LLC, 2017 WL 706624, at *11 (quoting Crowe v. Coleman, 113 F.3d 1536, 1539 (11th Cir. 1997)).

As an initial matter, this is not a situation where the Amended Complaint lumped all Defendants together and "asserted every allegation against all defendants generally." Acciard v. Whitney, No. 2:07-cv-476-UA-DNF, 2008 WL 5120898, at *7 (M.D. Fla. Dec. 4, 2008).  Instead, Relators divided Defendants into three groups—the Physician Investors, the Genesis Entities, and the Genesis Individual Defendants—and made factual allegations against Defendants as a whole, against each defined group of Defendants, and against certain Defendants individually.  (See generally doc. 32.)  For example, within the Physician Investors group, Relators included Lin, Shin, Newsom, Gale, Talarico, Nabert, and Becker.  (Id. at p. 8.)  Furthermore, Relators alleged that the Physician Investors "owned approximately 88% of [GVP]," (id. at p. 29); that the Physician Investors received remuneration in return for referring patients to GVP, (id. at pp. 29–30); that the GVP investment documents "provided ample information and warnings about the AKS" to potential investors, (id. at pp. 32); that "[e]ach of the Physician Investors was in a position to, and ultimately did, refer and influence referrals of vascular patients to [GVP]" that were "tainted [by] violation[s] of the AKS and FCA," (id. at p. 41); and that "Physician Investor Defendants[] paid, or caused to be paid, . . . profit distributions for the purpose of rewarding referrals already made to [GVP] and to induce future referrals, including those of federal and state health care program beneficiaries," (id. at p. 49).  Relators also made several factual allegations specifically pointed at each individual Physician Investor, including the amount of money in Medicare claims each Physician Investor referred to GVP and the changes in Defendants Newsom,

17

Talarico, and Becker's patient referral patterns after GVP opened.  (<u>Id.</u> at pp. 42-44.)  In addition, Relators provided lists of purportedly false Medicare and Medicaid claims that Becker, Gale, Lin, Nabert, Newsom, Shin, and Talarico referred to GVP that include claim numbers, submission dates, the beneficiaries' first and last initials, and the "Total Claim Paid."  (<u>See</u> docs. 32-1; 32-2.)

In similar fashion, the Amended Complaint grouped James O'Dare, Barbara O'Dare, Yanes, and Geer together as the Genesis Individual Defendants and made factual allegations against them as a group and as individuals.  (<u>See generally</u> doc. 32.)  Relators alleged that the Genesis Individual Defendants "formed the Genesis Entities as a structure by which [they] could operate vascular centers," (doc. 32, p. 28); told "prospective investors . . . that a $100,000 investment [in GVP] would yield a return of $175,000 per year," (<u>id.</u>); told prospective investors that profit distributions depended on the number of patient referrals, (<u>id.</u>); targeted physicians who "were in the best position to refer patients and influence referrals to [GVP]," (<u>id.</u>); "explained to the prospective investors the financial benefits of moving their referrals to an entity in which the investors had an ownership interest," (<u>id.</u> at pp. 28–29); were familiar with the requirements of the AKS, (<u>id.</u> at pp. 30–31); and "offered the prospective investors the opportunity to purchase up to 90% ownership of [GVP]," (<u>id.</u> at p. 29).  Relators also made several allegations against James O'Dare, Barbara O'Dare, and Geer as individuals.  Relators alleged that James O'Dare is the "founder and principal" of Genesis Management, the sole shareholder of Genesis Global, and an investor in GVP "through his wholly-owned subsidiary Genesis Vascular;" that Barbara O'Dare is the former CEO of GVP and the current CEO of Genesis Global, Genesis Vascular, and Genesis Management; and that Geer is the former president of GVP and the current president of Genesis Vascular, Genesis Global, and Genesis Management.  (<u>Id.</u> at pp. 6–7.)  Concerning Geer, Relators further alleged that he discussed the AKS and its safe harbors with the Physician Investors during

sales pitches, (id. at p. 30–31), and tracked and updated the Physician Investors on the number of patients referred to GVP, (id. at p. 45).  Concerning the O'Dares, Relators allege that they are well acquainted with the AKS and its safe harbors, (id. at p. 30), hold "complete control over the Genesis Entities and exercise such control to inure their own personal benefit such that the Genesis Entities serve as the O'Dares'[] alter ego," (id. at p. 59), and that the O'Dares used the Genesis Entities to "communicate with, provide data to, and give instruction to the Physician Investors," (id. at p. 58).

Regarding the Genesis Entities, Relators allege that they were the corporate structure through which the Genesis Individual Defendants operated vascular centers across the country, including GVP.  (Id. at p. 28.)  Relators allege that Genesis Vascular, Genesis Global, and Genesis Management operated GVP, (id. at p. 58); that GVP filed false claims and received payment from Medicare for claims referred by the Physician Investors, (id. at p. 42); and that the Genesis Entities operated as "alter egos" of one another, (id. at p. 58).  According to the Amended Complaint, Genesis Management "served as [GVP]'s manager and, along with Genesis Global, ran the business side of GVP's day-to-day operations."  (Id.)  Relators also allege that Genesis Management "employed [GVP]'s staff, provided technical, financial, and human resource support, handled internal and external marketing, provided data to [GVP] and its Physician Investors, and handled in-house billing functions."  (Id.)  Furthermore, Relators allege that Genesis Global owned Genesis Management and communicated with, provided data to, and instructed the Physician Investors.  (Id.)  Finally, Relators allege that the Genesis Entities do not operate as separate companies because they "do not have separate bank accounts, do not maintain separate corporate records, have no independent employees, and do not otherwise maintain corporate formalities."

(Id. at p. 59.)  Indeed, the Genesis Entities share the same principal place of business, the same phone number, the same email platform system, and the same executives.  (Id.)

Based on the foregoing, the Court concludes that the factual allegations against individual Defendants as well as against similarly situated Defendants do not violate Rules 8 or 9(b).  Indeed, the factual allegations in the Amended Complaint provide fair and reasonable notice to Defendants of their purported roles in the alleged fraudulent scheme.  See Bibby, 906 F. Supp. 2d at 1298 ("Because the collective pleading approach Relators employed has not created confusion regarding the specific conduct attributable to each defendant, this practice does not require dismissal under Rule 9(b).").  Although Relators categorized Defendants into several groups for several allegations throughout the Amended Complaint, each Defendant within a group is alleged to have played the same role in the alleged kickback scheme.  As such, "[t]his is not a situation where the collective pleading of fraud-allegations . . . results in a lack of clarity as to what conduct is alleged against each individual defendant."  Id.; see also Raimbeault v. Accurate Mach. & Tool, LLC, No. 14-CIV020136, 2014 WL 5795187, at *13 (S.D. Fla. Oct. 2, 2014) ("Despite several times listing the Defendants together and describing many of their actions identically, Plaintiffs have done enough here to meet the Rule 9(b) standard . . . .");  Acciard, 2008 WL 5120898, at *7, 10 ("[S]ome defendants had the same role in the alleged fraudulent scheme, and there are certain allegations as to groups of defendants throughout the complaint.  However, this is not a situation where plaintiffs are suing several defendants that had different parts in a scheme and asserted every allegation against all defendants generally.").  Had Relators separately alleged this conduct as to each individual Defendant, Relators would have "cop[ied] and paste[d] the same language . . . into dozens of separate paragraphs."  Raimbeault, 2014 WL 5795187, at *12.  Rule 9(b) does not require that.  See id.; see also Bibby, 906 F. Supp. 2d at 1298 ("The substantive allegations would

have been unchanged if Relators had copied the relevant paragraphs 10 times and replaced the word 'Defendants' with Wells Fargo.").

However, while the factual allegations in the Amended Complaint notify each Defendant of his, her, or its role in the purported fraudulent scheme, Relators' collective pleading under each count alleged in the Amended Complaint is inappropriate.  (See doc 32, pp. 60–64.)  Instead of specifying which count is alleged against which Defendants or what conduct relates to which count, Relators lump all Defendants together under each count.  (See id.)  For example, under Count I, Relators allege that "Defendants violated the False Claims Act" but fail to specify which Defendant's conduct violated the FCA.  Relators then repeat this collective pleading style under each count in the Amended Complaint.  (Id.)  Moreover, as discussed in Discussion Section I.A., supra, each count in the Amended Complaint incorporates all preceding allegations into each count and fails to distinguish each Defendant's conduct.  Thus, Relators' collective pleading under each count raised in the Amended Complaint fails to satisfy Rule 9(b).  See Barron v. Lampley, No. 4:15-CV-0038-HLM, 2015 WL 12591006, at *19 (N.D. Ga. June 22, 2015) ("Count IV of the Complaint fails to state a claim for violations of Georgia RICO because incorporating all previous allegations into the Count and lumping together all Defendants are insufficient methods of pleading Rule 9(b).") (citing Brooks, 116 F.3d at 1381).  Thus, as discussed in Discussion Section I.A, supra, Relators must file a Second Amended Complaint as outlined in the Conclusion section, infra.

### C. Allegations against Statesboro Cardiology, C3 of Bulloch, the Trust, and Pooler Property Holdings

Defendants also argue that the claims against Statesboro Cardiology, C3 of Bulloch, the Trust, and Pooler Property Holdings are due to be dismissed because the Amended Complaint does not "set out a single substantive act that these entities purportedly committed which resulted in a

violation of the FCA." (Doc. 74-1, p. 5; see also doc. 75-1, p. 4.) Concerning the Trust, C3 of Bulloch, and Pooler Property Holdings, Relators appear to seek to hold those entities liable through an alter ego theory of liability and not through any direct involvement in the purported fraudulent scheme. (See doc. 32, pp. 6–8.) Indeed, Relators do not make any substantive allegations targeted towards these entities in the Amended Complaint, nor do they argue that any of these entities' own conduct violated the FCA. (See generally docs. 32, 88, 89.) Concerning the Trust, Relators allege—in the section of the Amended Complaint entitled "The Parties"— that "Defendant Alexis M. Shin, is upon information a[nd] belief, one of the trustees for the SJS (Stanley J. Shin) Family Trust, through which Dr. Shin and his family invested in [GVP] and received profit distributions from [GVP]." (Doc. 32, p. 7.) Relators then allege that "[f]or purposes of this lawsuit, Defendant Stanley J. Shin's knowledge, intent, and actions are imputable to the SJS Family Trust." (Id.) Concerning C3 of Bulloch, Relators alleged that Defendant Lin functions as its CEO, CFO, and Secretary and that, "[f]or purposes of this lawsuit, Defendant Lin's knowledge, intent, and actions are imputable to Defendant C3 of Bulloch Inc., through which Lin invested in [GVP] and received profit distributions from [GVP]." (Id. at pp. 6–7.) Concerning Pooler Property Holdings, Relators allege that Talarico is its sole owner and that "[f]or purposes of this lawsuit, Defendant Talarico's knowledge, intent, and actions are imputable to Defendant Pooler Property Holdings, LLC, through which Talarico invested in [GVP] and received profit distributions from [GVP]." (Id. at p. 8.) The Amended Complaint makes no other substantive allegations against Pooler Property Holdings, C3 of Bulloch, or the Trust. (See generally id.)

"Only in unusual circumstances will courts disregard the separate identities of a parent and its subsidiaries, even a wholly-owned subsidiary." United States ex rel. Lawson v. Aegis Therapies, Inc., 2:10-cv-72, 2013 WL 5816501, at *4 (S.D. Ga. Oct. 29, 2013) (internal quotations

omitted).  Under federal law, to survive a motion to dismiss, Relators must allege "facts suggesting: (1) that there is a unit of interest and ownership among Defendants that makes their separate personalities no longer exist and (2) that an inequitable result would flow from treating Defendants separately."[9]  Id.  "In the context of an action brought under the FCA, the complaint must include allegations that Defendants abused their corporate forms to insulate themselves from FCA violations committed by subsidiaries."  Id.

Here, Relators alleged that Talarico is the sole owner of Pooler Property Holdings and used it as a vehicle through which to invest in GVP.  (Doc. 32, p. 8.)   However, Relators make no further factual allegations relating to any sort of unity of interest between Talarico and Pooler Property Holdings, nor do they allege any facts showing or argue that an inequitable result would occur if Talarico and Pooler Property Holdings were treated separately.  In the Eleventh Circuit,

---

[9]  A choice of law question exists as to whether federal law or Georgia law governs the alter ego liability question.  To the extent Relators allege claims based on the FCA, federal law controls the alter ego liability question as to those claims.  See Lawson, 2013 WL 5816501, at *4 ("Because relator's claims are brought under the False Claims Act and relate to the federal Medicare program, federal law, therefore, controls the veil-piercing question.") (quotations omitted) (citing U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 60 (D.D.C. 2007)).  In contrast, as to Relators' GFMCA claims, Georgia law governs the alter ego liability question as to those claims.  See United States v. Carell, 681 F. Supp. 2d 874, 890 (M.D. Tenn. 2009) ("[F]ederal common law determines the parameters of the alter ego doctrine where the underlying cause of action is based on a federal question.  Conversely, then, [state] law would apply where the alter-ego liability is premised on state-law causes of action.") (citation omitted).  However, federal law and Georgia law appear to be functionally identical on the issue of alter ego liability.  Compare Lawson, 2013 WL 5816501, at *4 (noting that to allege an alter ego liability theory under federal law, a relator must allege facts showing "(1) that there is a unit of interest and ownership among Defendants that makes their separate personalities no longer exist and (2) that an inequitable result would flow from treating [them] separately"), with United States v. Fid. Cap. Corp., 920 F.2d 827, 837 (11th Cir. 1991) ("To establish that a corporation is an alter ego [under Georgia law], a party must show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs, that the corporation and its owners have such unity of interest and ownership that they lack separate personalities, and that to observe the corporate form would work an injustice or promote fraud.") (citations omitted); see also United States Cap. Funding VI, Ltd. v. Patterson Bankshares, Inc., 137 F. Supp. 3d 1340, 1367 (S.D. Ga. 2015) ("Georgia law generally permits 'piercing the corporate veil' to hold owners liable for the transactions of a corporation that functions as their alter ego, or a mere instrumentality, rather than a separate corporate entity.").  Thus, the choice of law analysis has little, if any, effect on the outcome of Defendants' Motions to Dismiss.

"[t]he mere fact that a person owns and controls a corporation will not justify a finding of abuse of the corporate entity, even though that person may have used the corporation to promote his own ends." United States v. Fid. Cap. Corp., 920 F.2d at 837.  Furthermore, "courts routinely refuse to pierce the corporate veil based on . . . allegations that one company is the wholly-owned subsidiary of another." United States ex rel. Schaengold v. Mem'l Health, Inc., No. 4:11-cv-58, 2014 WL 6908856, at *13 (S.D. Ga. Dec. 8, 2014).  Thus, Relators' allegations that Defendant Talarico wholly owns Pooler Property Holdings and used that entity for his own personal benefit, standing alone, are inadequate to present an alter ego theory.

Likewise, although Relators alleged that Lin functions as the CEO, CFO, and Secretary of C3 of Bulloch, they made no other factual allegations regarding C3 of Bulloch's involvement in the fraud scheme, including whether Lin holds an ownership interest in the entity.  Furthermore, while "the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment," Grand Union Co. v. United States, 696 F.2d 888, 891 (11th Cir. 1983), Relators made no allegations as to how any GVP profit distributions benefitted C3 of Bulloch or whether Lin was acting within the scope of his employment as CEO, CFO, or Secretary while he engaged in the purported fraud scheme.  See, e.g., United States ex rel Silva v. VICI Mktg., LLC, 361 F. Supp. 3d 1245, 1255 (M.D. Fla. Feb. 13, 2019) ("The Complaint . . . nowhere alleges that Smith was acting on behalf of and within the scope of his employment with Stat Direct, as opposed to Z Stat Medical, when he entered into the kickback schemes.  Therefore, the Complaint . . . fails to plead fraud with particularity as to Stat Direct."); United States ex rel. Graves v. Plaza Med. Ctrs. Corp., No. 10-23382-CIV-MORENO, 2015 WL 11199840, at *3 (S.D. Fla. July 16, 2015) ("Binding precedent in this circuit clearly holds that, in cases brought under the [FCA], an entity will not be held responsible for the acts of

one of its employees unless the employee was acting within the scope of his authority and with the purpose of benefitting the entity.").  Because Relators failed to allege facts sufficient to show plausible liability under the FCA based on an alter ego theory of liability, the Court finds that the Amended Complaint is insufficiently pleaded as to Pooler Property Holdings and C3 of Bulloch. Compare Schaengold, 2014 WL 6908856, at *13 ("[T]he Government has alleged no more than that Memorial Hospital, Memorial Health, Provident and MUHP 'operated as a unitary health system,' that the senior management of Memorial Health, the parent company, and of Memorial Hospital 'controlled, directed, and made all significant business decisions for the entire health system,' and that the Boards of Memorial Health and of Memorial Hospital consisted of the same members and 'operated as a single body.'"); and Lawson, 2013 WL 5816501, at *5 ("The Government alleged no facts showing that Defendants' separate personalities exist under a common unit of ownership, and there are no facts showing why an inequitable result would flow from treating them as distinct."), with United States ex rel. Stepe v. RS Compounding LLC, 325 F.R.D. 699, 707 (M.D. Fla. 2017) (finding that the government provided an adequate basis for its piercing the veil theory when it alleged that defendant "was RS Compounding's sole shareholder and officer who received a high salary and took 'shareholder distributions from the company whenever he pleased'" and that defendant "removed most ill-gotten gains from RS Compounding" so that the entity could not "pay back the millions paid to it by TRICARE").

Concerning the Trust, Defendants argue that the Amended Complaint does not contain sufficient factual allegations to hold it liable for violations of the FCA and instead "merely states in [a] conclusory manner that the actions of . . . [Stanley] Shin . . . are 'imputable' to [the Trust]."[10] (Doc. 74-1, p. 5.)  The Court agrees.  The only factual allegations regarding the Trust are that

---

[10]  Defendants do not appear to dispute that a trust may be liable as the alter ego of its creator or that its creator's conduct can be "imputable" to the trust.  (See doc. 74-1.)

"Defendant Alexis M. Shin is, upon information [and] belief, one of the trustees" for the Trust and that Stanley Shin invested in GVP through the Trust.  (Doc. 32, p. 7.)  The Amended Complaint lacks any factual allegations regarding the type of trust, who is the settlor of the trust, who are the beneficiaries of the trust, Alexis Shin's relation to Stanley Shin, how any injustice would occur if the Trust were not considered an alter ego of Stanley Shin, or how the Trust benefitted from any GVP profit distributions.  Thus, the Court concludes that Relators' minimal allegations regarding the Trust and Alexis Shin are not "enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); compare Great Am. Ins. Co. v. Am. Pan & Eng'g Co., Inc., No. 3:12-cv-129-TCB, 2012 WL 13028208, at *3 (N.D. Ga. Dec. 11, 2012) ("GAIC avers that Nader and the trust are not separate entities because Nader, with his parents, 'maintained control over the Trust at all times from its formation, up to the present time.' . . . Consequently, GAIC's factual allegations that Nader disregarded the trust form in its alter-ego claim are 'not enough to raise a right to relief above the speculative level.'"), with Carell, 681 F. Supp. 2d at 892 ("[T]he Court finds that the Government has adequately alleged facts which, if proved, would support recovery against the Trust on an alter ego basis under either state or federal common law. These include the allegations that Carell was the sole settler of the Trust and his family is the sole beneficiary; the trustee is Carell's long time agent; even after the transfer of Diversified's stock to the Trust, the management and business of Diversified did not change, and Carell continued to work for and to run Diversified even after its transfer to the Trust; the transfer of stock was not an arms-length transaction and involved the exchange of little or no consideration; the Trust benefited from the overpayment; and an injustice would be effected if the Trust were not held liable as an alter ego of Carell.").  However, the Court will provide Relators one opportunity to amend their Amended Complaint to add any appropriate allegations against C3 of Bulloch,

26

Pooler Property Holdings, and the Trust.   Therefore, Relators must file a Second Amended Complaint as outlined in the Conclusion section, <u>infra</u>.

Unlike with C3 of Bulloch, the Trust, and Pooler Property Holdings, Relators appear to seek to hold Statesboro Cardiology liable not for functioning as an alter ego of any Defendant but for its direct involvement in the fraudulent scheme.   Indeed, the Amended Complaint does make factual allegations against Statesboro Cardiology regarding its own conduct.   For example, the Amended Complaint alleges that Statesboro Cardiology participated in a "billing scheme" with GVP by which GVP and Statesboro Cardiology "disguised the location of certain billings," "falsely stated" where certain vascular procedures and tests on patients were performed, and billed Medicare for those claims.   (Doc. 32, pp. 47–48.)   The Amended Complaint then describes two examples in which Statesboro Cardiology billed Medicare for purportedly false claims resulting from that billing scheme.   (<u>Id.</u>)   Furthermore, the Amended Complaint alleges that Lin, Shin, and Nabert's partners at Statesboro Cardiology referred $190,000 in Medicare claims to GVP, (<u>id.</u> at p. 43), and that Statesboro Cardiology received over $1,000,000 in medical director payments and other payments for the purpose of rewarding referrals and inducing future referrals from Statesboro Cardiology to GVP, (<u>id.</u> at p. 49).   Thus, Defendants' argument that the Amended Complaint failed to "set out a single substantive act that [Statesboro Cardiology] purportedly committed" fails.   <u>See</u> <u>Silva</u>, 361 F. Supp. 3d at 1254 ("[T]he United States has . . . pled with particularity actions that Z Stat Medical specifically undertook in violation of the FCA.   For example, the United States alleges that Z Stat Medical submitted . . . false claims . . . and . . . paid millions in kickback commissions . . . [and it pleads] the dates and amounts of various kickback payments . . . and the details of some representative false claims.").

## II.    Count-Specific Deficiencies

Defendants also move to dismiss the Amended Complaint on two grounds specific to the FCA and GMFCA: (1) that the Amended Complaint fails to properly allege that Defendants acted with the requisite scienter, (doc. 72, pp. 5–8; doc. 73, pp. 5–8; doc. 74-1, p. 19; doc. 80, pp. 8–11), and (2) that the Amended Complaint fails to sufficiently allege any FCA or GFMCA claims, (doc. 74-1, pp. 8–11; doc. 80, pp. 11–20).

"At the pleading stage, a complaint alleging violations of the FCA must satisfy two pleading requirements." United States ex rel. Matheny v. Health Sols., Inc., 671 F.3d 1217, 1222 (11th Cir. 2012). "First, the complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)). "[E]ach averment should be 'simple, concise, and direct,' with no technical form of pleading required." Clausen, 290 F.3d at 1308. Furthermore, the complaint must comply with Federal Rule of Civil Procedure 9(b), which "requires a party to 'state with particularity the circumstances constituting fraud or mistake.'" Matheny, 671 F.3d at 1222 (quoting Fed. R. Civ. P. 9(b)); see also Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1051 (11th Cir. 2015) ("In an action under the [FCA], Rule 8's pleading standard is supplemented but not supplanted by [Rule 9(b)]."). Rule 9(b)'s purpose is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges." Matheny, 671 F.3d at 1222 (alteration in original). Rule 9(b)'s "particularity requirement" is "satisfied if the complaint alleges 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" Id.; see also Urquilla-Diaz, 780 F.3d at 1052 ("[T]o satisfy Rule 9(b)'s heightened-pleading requirements, the relator must allege the actual presentment of a claim . . . with particularity, meaning particular facts about 'the who,

28

what, where, when, and how' of fraudulent submissions to the government.") (internal citations and quotations omitted).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b); see also Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001).  In reviewing a motion to dismiss, all well-pleaded facts in a complaint and all reasonable inferences drawn from those facts are taken as true.  Jackson v. Okaloosa County, 21 F.3d 1531, 1534 (11th Cir. 1994).

### A.    Relators Adequately Alleged Scienter for the FCA Claims

Defendants first argue that the Amended Complaint's allegations regarding scienter are insufficient and, thus, the Amended Complaint fails to state a claim under the FCA.  (Doc. 72, pp. 5–8; doc. 73, pp. 5–8; doc. 74-1, p. 19; doc. 80, pp. 8–11.)  To violate the AKS, the defendant must act "knowingly and willfully."  42 U.S.C. § 1320a-7b(b).  The FCA defines "knowing" and "knowingly" as having "actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  However, "[a] relator need not . . . prove a 'specific intent to defraud.'"  Heller, 2021 WL 488305, at *14 (quoting 31 U.S.C. § 3729(b)(1)(B)).  While the FCA's scienter requirement is "rigorous," knowledge and "other conditions of a person's mind may be alleged generally," even in FCA cases.  Id. (quoting Matheny, 671 F.3d at 1224).

The Amended Complaint includes several allegations that Defendants knowingly engaged in a kickback scheme to generate patient referrals for vascular and other related procedures at a clinic owned by several Defendants.  For example, Relators allege that "Defendants knowingly engaged in an arrangement and scheme with the principal purpose of assuring referrals by physicians to certain entities," that "the Genesis Entities, Genesis Individual Defendants, and

Physician Investors knowingly and willfully did something that . . . the AKS [] forbids," and that "Defendants knew [GVP] was not entitled to reimbursement for claims referred by individuals with whom an AKS-prohibited relationship existed."  (Doc. 32, pp. 3, 29, 50.)  Relators further point to the GVP investment documents, which allegedly informed Defendants about the AKS's prohibition against payments for referrals, warned that investments in healthcare providers were suspect, and outlined the general parameters of the AKS.  (Id. at p. 32.)  Relators also allege that Geer and Yanes discussed the AKS with potential investors at their sales pitches and that another initial investor raised concerns about the scheme's legality under the AKS with James O'Dare and Gale and subsequently backed out of the investment.  (Id. at pp. 31–32, 34.)

While Defendants argue that the Amended Complaint's allegations regarding scienter are "formulaic and utterly conclusory," (doc. 72, p. 6; see also doc. 80, pp. 9–11), Relators "need only plead [Defendants'] knowledge generally."  Heller, 2021 WL 488305, at *15 (citing Fed. R. Civ. P. 9(b)).  Thus, taking the allegations in the Amended Complaint as true, the Court finds that Relators satisfied their burden of alleging that Defendants acted knowingly and willfully.  See id. ("Throughout the Amended Complaint, Heller repeatedly alleges Guardian Atlanta knowingly offered kickbacks to . . . induce referrals . . . .  Treating Heller's allegations as true, the Court finds he has satisfied his pleading burden of alleging that Guardian Atlanta acted knowingly and willfully."); Silva, 361 F. Supp. 3d at 1254 ("[T]he United States' allegations regarding Smith's scienter—that he knowingly entered the kickback schemes and knew kickbacks are illegal—are sufficient at this stage.  The United States has clearly alleged that Smith knew that paying commissions per prescription to marketers regarding government-funded claims was illegal because of his research into anti-kickback statutes and his experience in the healthcare industry.").

**B.     AKS Violations**

Defendants next argue that Relators failed to sufficiently allege that they participated in a kickback scheme pursuant to Rule 9(b) because (1) Relators failed to describe with specificity the kickback conduct that violates the AKS; (2) Relators "state[d] in conclusory fashion that the investor arrangement did not fall within any AKS safe harbor;" and (3) Relators failed to "provide[] sufficient detail concerning how the remuneration (i.e., investment proceeds), in fact, induced or influenced the Moving Defendants to refer their patients to [GVP]."  (Doc. 74-1, pp. 8–11.)

"The [AKS] makes it a felony to offer kickbacks or other payments in exchange for referring patients 'for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.'" McNutt ex rel. United States v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005) (quoting 42 U.S.C. § 1320a-7b(b)(2)(A)).  "A violation of the [AKS] occurs when a defendant: (1) knowingly and willfully, (2) offers or pays any remuneration, directly or indirectly, (3) to induce a person to refer individuals to the defendant[] for the furnishing of medical services, (4) paid for by Medicare." United States ex rel. Johnson v. Bethany Hospice & Palliative Care, LLC, No. 4:16-cv-290, 2020 WL 1542339, at *6 (S.D. Ga. Mar. 31, 2020) (citation and quotations omitted).  To plead a violation of the AKS, one must do so with particularity. Mastej, 591 F. App'x at 703.  "Violations of the AKS are pled with particularity when the complaint provides 'the names of the doctors who received the incentives, the names of the defendant['s] employees who negotiated the incentives with the doctors, precisely what the incentives were, when they were provided, why they were provided, and why they were illegal.'" Johnson, 2020 WL 1542339, at *6 (quoting Mastej, 591 F. App'x at 705).

### 1.     Particularity under Rule 9(b)

Defendants first assert that Relators "do not describe with specificity what the exact kickback conduct comprised of." (Doc. 74-1, p. 9.)  Specifically, Defendants argue that Relators "do not provide sufficient enough facts, such as when each of the Moving Defendants received the remuneration, the names of individuals who negotiated the remuneration with the Moving Defendants, when the remuneration was provided, [] why the remuneration was provided," or whether "the remuneration actually resulted in referrals" to GVP.  (Id. at 9–10.)  The Court disagrees.

Here, Relators alleged facts regarding the kickback scheme and alleged remuneration. Specifically, Relators (1) named several podiatrists and cardiologists—the Physician Investors— who held ownership stakes in GVP, (doc. 32, p. 29); (2) alleged that the Physician Investors received profit distributions in exchange for referring patients to GVP, (id. at p. 49); (3) identified the Genesis Individual Defendants as the people who recruited the Physician Investors, (id. at pp. 28–29); (4) alleged that the Genesis Individual Defendants informed the Physician Investors that profit projections were "based, in large part, on capturing the relevant vascular referral market" that they controlled, (id. at p. 28); and (5) alleged that GVP distributed $700,000 in profit distributions to Genesis Vascular and the Physician Investors from May 2017 to November 2018, (id. at p. 49).  The Court finds that these allegations describe the kickback scheme with sufficient particularity to satisfy Rule 9(b).  See Mastej, 591 F. App'x at 705 ("Mastej's complaint identifies the financial incentive schemes in great detail.  He gives the names of the doctors who received the incentives, the names of the Defendants' employees who negotiated the incentives with the doctors, precisely what the incentives were, when they were provided, why they were provided, and why they were illegal."); but see Johnson, 2020 WL 1542339, at *7 (finding that the relators'

complaint did not describe a kickback scheme with sufficient particularity because the complaint did not contain factual allegations about how the remuneration was paid to the doctors, the amount of the remuneration, or when the payments occurred).

### 2.    Safe Harbor

Defendants next argue that Relators failed to satisfy Rule 9(b) because they only "state in conclusory fashion that the investor arrangement did not fall within any AKS safe harbor" and fail to explain "how each of the Moving Defendants violated the AKS by not complying with the safe harbor." (Doc. 74-1, p. 10.) However, courts treat AKS safe harbor provisions as affirmative defenses. See Vernon, 723 F.3d at 1271 (characterizing the AKS's bona fide employee safe harbor as an affirmative defense); United States ex rel. Herbold v. Dr.'s Choice Home Care, Inc., No. 8:15-cv-1044-T-33AEP, 2019 WL 5653459, at *11 (M.D. Fla. Oct. 31, 2019) (referring to the AKS's personal services and management contracts safe harbor as an affirmative defense). Thus, Relators are "not required to plead that any of the AKS's safe harbors are inapplicable to" the alleged kickback scheme. United States ex rel. Willis v. Angels of Hope Hospice, Inc., No. 5:11-CV-041(MTT), 2014 WL 684657, at *11 (M.D. Ga. Feb. 21, 2014); see also Herbold, 2019 WL 5653459, at *11 ("The personal services and management contracts safe harbor is an affirmative defense under the [AKS], and the United States is not required to prove such an affirmative defense is inapplicable at the motion to dismiss stage."); United States ex rel. Osheroff v. Humana, Inc., No. 10-24486-cv-SCOLA, 2012 WL 4479072, at *10 (S.D. Fla. Sept. 28, 2012) ("At bottom, the safe harbors provide Defendants with an affirmative defense, and their alleged inapplicability to the case at bar is not an element of Relator's claim."); United States v. Medoc Health Servs. LLC, 470 F. Supp. 3d 638, 651 (N.D. Tex. 2020) ("[T]he [AKS] 'safe harbors' are affirmative defenses on which the Defendants bear the burden of proof.").

3.       **Remuneration**

Defendants next argue that Relators' "AKS allegations must fail because they have not provided sufficient detail concerning how the remuneration (*i.e.*, investment proceeds), in fact, induced or influenced the Moving Defendants to refer their patients to GVP." (Doc. 74-1, p. 11.) The AKS prohibits "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or kind . . . *in return for* referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1)(A) (emphasis added).

The Court finds that Relators sufficiently alleged that the Physician Investors referred patients to GVP in return for increased profit distributions. In the Amended Complaint, Relators allege that the Genesis Individual Defendants informed the Physician Investors that "a $100,000 investment . . . would yield a return of $175,000 per year" but that those projections were "based . . . on capturing the relevant vascular referral market controlled by [the Physician Investors]." (Doc. 32, p. 28.) The Amended Complaint further alleges that the Genesis Individual Defendants "explained to the prospective investors the financial benefits of moving their referrals to an entity in which the investors had an ownership interest." (Id. at 29.) Specific to Shin, Nabert, and Lin, Relators allege that each referred $266,000, $122,000, and $17,000 worth of Medicare claims to the GVP, respectively. (Id. at p. 42.) Furthermore, Relators allege the Pooler clinic distributed $700,000 in profits to the Physician Investors from May 2017 to November 2018 alone. (Id. at p. 49.) Relators allege that this ownership structure by which the Physician Investors referred patients to the Pooler clinic in exchange for profit distributions incentivized "the Physician Investor[s] . . . to refer vascular patients" to GVP and that "[w]ithout federal and state healthcare

payor reimbursements for the Physician Investor referrals, [GVP] would not have been in a position to pay out any profit distributions." (Id. at pp. 49–50.)  The Court concludes that these allegations allege in adequate detail how the profit distributions induced the Physician Investors to refer patients to GVP.  See Mastej, 591 F. App'x at 705 (holding that Relator's complaint sufficiently explained the renumeration scheme because it "provide[d] specific details about the . . . scheme the Defendants utilized to induce . . . doctors to refer Medicare patients for treatment at Defendant's hospital," and "identifie[d] the names of all . . . doctors who allegedly referred patients after having received . . . financial benefits from Defendants").

**C.    Sufficiency of the FCA and GFMCA Claims**

**1.    Presentment Clause (31 U.S.C. § 3729(a)(1)(A)**

Defendants next argue that Relators failed to satisfy the presentment requirement under 31 U.S.C. § 3729(a)(1)(A) and the mirroring GFMCA claim.  (Doc. 74-1, pp. 12–15; doc. 80, p. 14.) Under the FCA's Presentment Clause, any person who "*knowingly presents, or causes to be presented*, a false or fraudulent claim for payment or approval" is liable to the United States government.  31 U.S.C. § 3729(a)(1)(A) (emphasis added).  Indeed, "healthcare providers do not violate the FCA simply by having a financial relationship with a doctor. . . . It is the submission and payment of a false Medicare claim and false certification of compliance with the law that creates FCA liability."  Mastej, 591 F. App'x at 706.  Rule 9(b) requires an FCA relator to plead the submission of a false claim with particularity.  See Matheny, 671 F.3d at 1224–25.  To do so, a relator "must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result."  Id. at 1225.  "Providing exact billing data—name, date, amount, and services rendered—or attaching a representative sample is one way a complaint can establish the necessary

indicia of reliability that a false claim was actually submitted." <u>Mastej</u>, 591 F. App'x at 704. Alternatively, "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims." <u>Id.</u> However, a relator cannot "merely . . . describe a private scheme in detail but then . . . allege simply and without any stated reason . . . that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." <u>Clausen</u>, 290 F.3d at 1311.

Defendants argue that Relators failed to satisfy the FCA's presentment requirement as they only "vaguely allude to claims being submitted and GVP receiving payments from Medicare." (Doc. 74-1, p. 12.)  While Defendants recognize that Relators provided seven "Patient Examples" in the Amended Complaint and attached lists of claims that Defendants purportedly submitted to Medicare and Medicaid for payment, (docs. 32-1, 32-2), Defendants assert that those examples and exhibits are insufficient to satisfy Rule 9(b) because they "fail to identify actual false claims that were submitted to the government" and "do not show how specifically th[o]se claims were false, what the claimed services were for, or the payment amount requested in the claim," (doc. 74-1, p. 14).  Defendants also contend that Relators "are neither insiders nor former employees of any of the Defendants," and, therefore, "they do not and could not have direct knowledge of GVP internal operations or how or when claims from GVP or Statesboro Cardiology would be submitted." (<u>Id.</u> at p. 13.)

As an initial matter, Relators do not appear to contend that they are insiders or former employees with direct knowledge of GVP's billing practices or that they witnessed the submission of any false claims to the federal government. (<u>See</u> doc. 88.)  While Relators claim to "have direct knowledge of Defendants' fraud," (doc. 32, p. 4), Relators have not supported that allegation with

any specific facts, (see id.).  Thus, Relators are not relying on any "direct, first-hand knowledge" of Defendants' submission of false claims to satisfy Rule 9(b).  Instead, Relators contend that by including "specific examples of [false] claims . . . set out—by claim number, submission date, first and last initials of patient name, paid amount, and referring doctor—in" the exhibits attached to the Amended Complaint, they "identified the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result."  (Doc. 88, pp. 18–19 (citation and quotations omitted); see also docs. 32-1, 32-2.)

While Defendants correctly assert that certain information, such as what services the claims covered or copies of payment forms, are not provided in the exhibits, only "some of [the billing] information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)."  Clausen, 290 F.3d at 1312 n.21.  Exhibit A provides a list of Medicare claims for which GVP was reimbursed.  (Doc. 32., p. 49; doc. 32-1.)  In this list, Relators provide the claim number, submission date, patients' first and last initials, the "Total Claim Paid," and the referring physician. (Doc. 32-1.)  Exhibit B provides a list of Georgia Medicaid claims, which—like Exhibit A—sets out claim numbers, submission dates, patients' first and last initials, the "Total Claim Paid," and the referring physician.  (Doc. 32-2.)  Finally, Exhibit C provides a list of Medicare claims for which Defendants Lin and GVP billed Medicare.  (Doc. 32, p. 51.)  This list—like Exhibits A and B—includes claim numbers, submission dates, beneficiaries' first and last initials, procedure codes, "Total Claim Paid," and referring physicians.  (Doc. 32-3.)  Furthermore, the Amended Complaint alleges that GVP billed these claims to federal and state healthcare programs, including Medicare and Medicaid.  (Doc. 32, pp. 37, 49.)  While the Amended Complaint does not allege that each Defendant personally submitted false claims to Medicare and Medicaid, Relators set out

factual allegations in the Amended Complaint showing that each Defendant caused false claims to be submitted to Medicare and Medicaid.  Indeed, the Amended Complaint alleges—and the list of Medicare and Medicaid claims attached to the Amended Complaint shows—that the Physician Investors referred patients to GVP, a company in which the Physician Investors held financial interests, knowing that claims arising from those patients violated the AKS and/or the Stark Act and would be submitted to Medicare and Medicaid.  (Id. at pp. 42, 50; see also docs. 32-1, 32-2, 32-3.).  Furthermore, the Amended Complaint alleges the Genesis Individual Defendants and Genesis Entities were instrumental in recruiting the Physician Investors, orchestrating the fraud scheme, and causing GVP to submit false claims to Medicare and Medicaid.  (Id. at p. 28–29); see Silva, 361 F. Supp. 3d at 1253 ("The United States is correct that Smith can be held liable under the FCA if he caused the submission of false claims, even if he did not submit the claims himself. The Complaint . . . alleges with particularity how Smith caused false claims to be submitted to TRICARE—specifically, he allegedly negotiated the kickback schemes . . . .") (citations omitted); United States v. Berkeley Heartlab, Inc. 225 F. Supp. 3d 487, 499 (D.S.C. 2016) ("Taking the allegations as true and applying the traditional tort principles of proximate causation, the Court finds that HDL's and Singulex's submission of false claims was the necessary, foreseeable, and obvious consequence of these Defendants' participation in the abovementioned schemes.") (citations omitted); see also Ruckh v. Salus Rehab., LLC, 963 F.3d 1089, 1107 (11th Cir. 2020) ("[F]or 'cause to be presented' claims, proximate causation is a useful and appropriate standard by which to determine whether there is sufficient nexus between the defendant's conduct and the presentation of a false claim.").

Based on these allegations regarding false claims submitted to the federal government, the Court concludes that Relators sufficiently pled that Defendants presented or caused to be presented

false claims to federal and state healthcare programs.  Compare Matheny, 671 F.3d at 1225 ("Relators pled specifics relating to the submission of a specific statement in a specific document, submitted by a specific person during a specific review, as required by a particular government contract."), and United States ex rel. Heesch v. Diagnostic Physicians Grp., P.C., No. 11-0364-KD-B, 2014 WL 2155363, at *7 (S.D. Ala. May 22, 2014) (finding that the government sufficiently alleged that the defendants "submitted claims to the Government for . . . services" by attaching an exhibit that "include[d] the provider name, the claim number, the date of the claim, the specific procedure for which reimbursement was sought, a description of the procedure, the place of service, the amount paid for the service, and the name of the referring physician"), with Clausen, 290 F.3d at 1312 ("Clausen merely offers conclusory statements, and does not adequately allege when—or even if—the schemes were brought into fruition.  . . .  No amounts of charges were identified.  No actual dates were alleged.  No policies about billing or even second hand information about billing practices were described . . . .  No copy of a single bill or payment was provided."), and United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1359 (11th Cir. 2006) ("Atkins has described in detail what he believes is an elaborate scheme for defrauding the government by submitting false claims.  He cites particular patients, dates and corresponding medical records for services that he contends were not eligible for government reimbursement. . . . [However,] Atkins fails to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes.").

### 2.     Make-or-Use Clause (31 U.S.C. § 3729(a)(1)(B))

Defendants next argue that Relators failed to state a claim under the FCA's make-or-use provision, 31 U.S.C. § 3729(a)(1)(B).  (Doc. 74-1, pp. 14–15.)  Under the make-or-use provision, any person who "knowingly makes, uses, or causes to be made or used, a false record or statement

material to a false or fraudulent claim" is liable to the federal government. 31 U.S.C. § 3729(a)(1)(B). To plead a violation of the make-or-use provision, "a relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." United States ex rel. Phalp v. Lincare Holdings, Inc., 857 F.3d 1148, 1154 (11th Cir. 2017).

Defendants argue: (1) that Relators failed to show that particular false claims were paid; and (2) that the Amended Complaint does not allege that any Defendants used a false record or statement material to a false or fraudulent claim. (Doc. 74-1, p. 15.) Concerning the first argument, Relators respond that the Amended Complaint sufficiently alleges that false claims were paid for the same reasons it sufficiently pled an FCA presentment clause violation—namely, that their attached exhibits contain specific claims GVP submitted to Medicare and Medicaid based on patient referrals from the Physician Investors. (Doc. 88, p. 22.) Concerning the second argument, Relators respond that the Amended Complaint alleges that Medicare and Medicaid billing requires certification that "their claims comply 'with all applicable . . . laws, regulations, and program instructions for payment including but not limited to the [AKS].'" (Id. (quoting doc. 32, pp. 17, 19).) Thus, according to Relators, "[b]y engaging in the unlawful referral-for-profit scheme, each of the Defendants . . . caused certifications—made in connection with services provided to referred patients—to be false." (Id.)

The Eleventh Circuit has expressly adopted such a theory of liability under the FCA, which it refers to as the "false certification" theory. Ruckh, 963 F.3d at 1103. Under the false certification theory, "a defendant may be found liable for falsely certifying its compliance with applicable laws," including the AKS and Stark Act. Id.; see also McNutt, 423 F.3d at 1259–60 (explaining that because compliance with the AKS is necessary for reimbursement under

Medicare, a defendant who violates the AKS and thereafter submits those claims to Medicare for reimbursement has submitted false claims under the FCA; United States v. AseraCare, Inc., 938 F.3d 1278, 1284 (11th Cir. 2019) ("FCA liability may arise where a defendant falsely asserts or implies that it has complied with a statutory or regulatory requirement when, in actuality, it has not so complied."); United States ex rel. Schaengold v. Mem'l Health, Inc., No. 4:11-cv-58, 2014 WL 7272598, at *1 (S.D. Ga. Dec. 18, 2014) ("Falsely certifying compliance with the Stark Statute or the AKS can form the basis of FCA liability.").

Here, while the Amended Complaint's shotgun pleading style makes it difficult to discern which factual allegations relate to the make-or-use clause claim, the Court finds that Relators sufficiently alleged facts showing that Defendants violated the FCA's make-or-use provision. Regarding Defendants' first argument, Relators sufficiently alleged the payment of false claims for the same reasons discussed in Discussion Section II.C.1, supra.  Concerning the second argument, Relators alleged: (1) that, for medical providers to participate in Medicare, the medical providers must certify that their services are "reasonable and necessary" and must submit a CMA 1500 form, certifying that their claims comply with applicable Medicare laws and regulations for payment, including the AKS and the Stark Act, (doc. 32, pp. 16–17); (2) that Defendants participated in Medicare and Medicaid, (id. at p. 37); (3) that, as discussed above in Discussion Section II.B, supra, Defendants violated the AKS, rendering them ineligible to receive reimbursement from Medicare; (4) that Defendants knew the AKS prohibited the referral scheme, (id. at pp. 29–35); and (5) that Defendants submitted claims to Medicare and Medicaid despite knowing those claims were tainted with AKS violations, (id. at p. 36).  Based on these allegations, the Court finds that Relator sufficiently alleged an FCA make-or-use clause claim against Defendants.  See McNutt, 423 F.3d at 1259 ("The violation of the regulations and the

corresponding submission of claims for which payment is known by the claimant not to be owed makes the claims false under [the make-or-use provision].”); United States ex rel. Freedman v. Suarez-Hoyos, 781 F. Supp. 2d 1270, 1278–79 (M.D. Fla. 2011) (“The Government has alleged in the complaint that: (1) compliance with the AKS is a prerequisite for receiving payment from the Medicare program; (2) Defendants were aware that their arrangement violated the AKS, and as such, they were not entitled to receive payment for their claims from Medicare; and (3) despite this knowledge, they submitted claims to Medicare that they knew were not entitled to payment.  These allegations are sufficient to state a claim for FCA liability based on the theory of implied false certification.”); United States v. Space Coast Med. Assocs., L.L.P., 94 F. Supp. 3d 1250, 1258–59 (M.D. Fla. Feb. 6, 2015) (“Relators have specifically pleaded what rules Defendants allegedly broke and how they broke them. . . . Relators have sufficiently pleaded false claims submitted to the government, in violation of these rules.  Thus, Relators have sufficiently alleged, for purposes of pleading, that Defendants broke rules and submitted impliedly false certifications.”).

### 3.    Conspiracy Claim

Defendants next argue that Relators failed to sufficiently allege an FCA conspiracy claim. (Doc. 74-1, pp. 15–16; doc. 80, pp. 14–16.)  To state a conspiracy claim under the FCA, a relator “must show[:] (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim.” Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005) (quotations omitted).  “A conspiracy rarely can be established by showing ‘an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators[] and from other

circumstantial evidence.'" <u>Wallace</u>, 2020 WL 4500493, at *20 (quoting <u>City of Tuscaloosa v.</u> <u>Harcross Chems, Inc.</u>, 158 F.3d 548, 569 (11th Cir. 1998)).

Defendants assert that "dismissal is appropriate here because the Relators have not identified any agreement between or amongst Defendants to conspire to defraud the government." (Doc. 74-1, p. 16; <u>see also</u> doc. 80, p. 14.)  Like with the other claims raised in the Amended Complaint, Relators' shotgun pleading style, as discussed in Discussion Section I.A, <u>supra</u>, makes it difficult to determine which factual allegations relate to the FCA and GFMCA conspiracy claims.  However, the Amended Complaint does allege facts showing that Defendants knew: (1) that the referral scheme violated the AKS and Stark Act; (2) that GVP would file claims with Medicare and Medicaid for patients referred to GVP by the Physician Investors; and (3) that Medicare and Medicaid would reimburse GVP for at least some of the patients referred to GVP by the Physician Investors.  (Doc. 32, pp. 29–34.)  The Amended Complaint also shows that the Physician Investors invested in GVP despite that knowledge.  (<u>Id.</u> at 34–35.)  Furthermore, Relators provided lists of patient claims referred by the Physician Investors to GVP that GVP filed for reimbursement with Medicare and Medicaid.  (Docs. 32-1, 32-2.)  Therefore, while Relators did not use the term "agreement" in the Amended Complaint to refer to any conspiracy by Defendants to defraud the government, the aforementioned allegations do raise a reasonable inference that Defendants agreed to cause the government to reimburse them for false Medicare and Medicaid claims.  This sort of inference is sufficient to survive a motion to dismiss an FCA conspiracy claim.  <u>See, e.g.</u>, <u>Wallace</u>, 2020 WL 4500493, at *20 ("Considering the entirety of the Amended Complaint's allegations about the behavior of the alleged conspirators, it is plausible to infer that Exactech and Dr. Lemak agreed to get false claims paid by the government.").  Accordingly, the Court finds that Relators sufficiently pled an FCA conspiracy claim, and thus,

dismissal is not warranted.  See United States v. Marder, No. 13-cv-24503-KMM, 2015 WL 13264207, at *5 (S.D. Fla. May 14, 2015) ("The Court finds that the scheme that is detailed in the Complaint would not have been possible without agreement and coordination among all Defendants.  The direct and circumstantial evidence alleged in the Complaint, read in the light most favorable to the Government, establishes that the Defendants agreed to and implemented the scheme through multiple coordinated steps."); United States ex rel. Fite v. Aperian Lab'y Sols., LLC, No. 5:13-cv-01626-LSC, 2016 WL 11164665, at *8 (N.D. Ala. Apr. 26, 2016) ("Fite's complaint alleges facts showing that the Compass Defendants, as well as Aperian, were aware that (1) their arrangements with Aperian violated the AKS, and (2) some of the referrals received as a result of those arrangements would be submitted to the government for payment. Despite that awareness, the Compass Defendants forged ahead to carry out these arrangements in a manner that in fact caused Aperian to submit false claims.  Further, Fite alleges in detail the amounts paid by the government on those false claims, thus showing the final element that the United States suffered damages.  Fite's conspiracy claims against the Compass Defendants are sufficiently pled and dismissal is thus not warranted.").

### 4.      Reverse False Claim

Finally, Defendants argue that the Court should dismiss Relators' reverse false claim count because the Amended Complaint failed to "plausibly plead a definite and clear obligation [on Defendants] to pay money to the Government at the time of the allegedly false statements" and because the reverse false claims count "recasts" the presentment and make-or-use claims by relying on the same allegations as those claims.[11]  (Doc. 80, pp. 17–18; see also doc. 74-1, pp. 17–

---

[11]  Defendants also argue that the reverse false claim action should be dismissed because "Relators have not shown in sufficient detail that the Defendants submitted claims to the government or received payment for such claims."  (Doc. 74-1, p. 18; see also doc. 80, p. 14.)  However, as discussed in Discussion Sections

18.)  In their Response, Relators argue that 42 U.S.C. § 1320a-7k(d)(1) created an obligation for Defendants to return any "overpayments" they received from Medicare and Medicaid and that their failure to do so constitutes a violation of the FCA and GFMCA reverse false claim provisions. (Doc. 96, pp. 18–19.)

"To sustain a reverse false claim action, relators must show that the defendants owed an obligation to pay money to the United States at the time of the allegedly false statements." Matheny, 671 F.3d at 1223.  The FCA defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of overpayment."  31 U.S.C. § 3729(b)(3).  Under 42 U.S.C. § 1320a-7k(d), any person who receives an "overpayment" from Medicare or Medicaid must report and return the overpayment within "60 days after the date on which the overpayment was identified."  42 U.S.C. § 1320a-7k(d)(1)–(2).  "Any overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation" for purposes of the FCA's reverse false claim provision.  42 U.S.C. § 1320a-7k(d)(3); see also 31 U.S.C. § 3729(b)(3).

Here, as with the other FCA claims raised in the Amended Complaint, Relators' shotgun pleading style, as discussed in Discussion Section I.A, supra, makes it difficult to discern which factual allegations relate to the FCA and GFMCA reverse false claim counts.  However, Relators do allege throughout the Amended Complaint that Defendants knew the unlawful nature of the kickback scheme, that GVP continued to bill and accept payment from federal healthcare programs for false claims even after the federal government began their investigation into the kickback scheme, and that Defendants never reported or returned any money they received from Medicare

---

II.C.1 and 2, supra, Relators sufficiently alleged that Defendants presented or caused to be presented false claims the government.  Thus, this argument fails.

and Medicaid for the purportedly false claims.  (Doc. 32, pp. 29–37, 52.)  Furthermore, district

courts within the Eleventh Circuit have concluded similar allegations give rise to a violation of the

reverse false claim provision.  For example, in United States v. Crumb, the United States District

Court for the Southern District of Alabama held:

> On its face, the Amended Complaint identifies sufficient facts to show that defendants had a concrete obligation to pay the Government at the time of the alleged avoidance.  In particular, the Amended Complaint alleges that, at least by 2010, defendants "had actual knowledge of the improper 76942 and 76 modifier claim submissions," yet they "did not take any steps to identify and return said moneys to Cahaba and/or Alabama Medicaid within 60 days as required by the ACA."  The Amended Complaint further alleges that even in 2014, when they knew the Government was conducting FCA investigations into alleged false claims submitted to federal health programs relating to unnecessary Botox injections and ultrasound guidance, defendants "failed to take any corrective or repayment action."  These allegations sufficiently set forth an "obligation" within the meaning of § 3729(b)(3), specifically "an established duty . . . arising from . . . the retention of any overpayment," so as to state a cause of action for a reverse false claim under the post-FERA version of the False Claims Act.

No. 15-0655-WS-N, 2016 WL 4480690, at *16 (S.D. Ala. Aug. 24, 2016) (internal citations and

footnotes omitted).  Thus, the Court declines to dismiss Relators' reverse false claim actions.  See

RS Compounding LLC, 325 F.R.D. at 709 ("The Court agrees with the United States that an

obligation as defined in § 3729(b)(3) need not be a contractual provision.  And the United States

clearly identifies a non-contractual obligation owed by RS Compounding and Gobea: the

'concrete' obligation to repay under § 3729(b)(3) and § 3729(a)(1)(G) was triggered when the

defendants knew they had received funds to which they were not entitled and retained the funds

instead of returning them.") (internal citation and quotations omitted); see also Schaengold, 2014

WL 6908856, at *17 ("[C]ourts have recognized that the obligation to refund Medicare payments

made in violation of the Stark Statute is an obligation under the FCA['s reverse false claim

provision.]").

## CONCLUSION

For the reasons set forth above, the Court **GRANTS in part** and **DENIES in part** Defendants' Motions to Dismiss Relators' Amended Complaint.  (Docs. 72, 73, 74, 75, 80, 81.) The Court **ORDERS** Relators to file, within **SEVEN (7) DAYS** of this Order, a comprehensive operative complaint entitled "Relators' Second Amended Complaint."  Therein, Relators shall: (1) identify and include within each separate count the specific factual allegations that Relators contend support each count; (2) allege with particularity Defendant C3 of Bulloch, Defendant Pooler Property Holdings, and Defendant SJS Family Trust's involvement in the purported fraud scheme; and (3) specifically identify which Defendants Relators contend are liable under each count.  Relators **SHALL NOT** make any additions, modifications, or other amendments to their Amended Complaint other than those explicitly ordered herein.  Defendants **SHALL** file an answer or other responsive pleading within **TWENTY-ONE (21) DAYS** of Relators' date of filing the Second Amended Complaint.  Relators are hereby advised that the failure to timely file a Second Amended Complaint that comports with the instructions outlined herein may result in the dismissal of this case.

**SO ORDERED**, this 20th day of September, 2021.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA